IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

GARY LEDERMAN,              )
                                )
            Plaintiff,    )
                                )
       vs.               )  1:07-cv-01708-RPM
                                )
FRONTIER FIRE PROTECTION, INC. )
a Colorado Corporation, and    )
the ESTATE OF KARL SMITH,      )
                                )
            Defendants.   )
_____

TRIAL TO JURY - DAY 1
PARTIAL TRANSCRIPT OF PROCEEDINGS
_____

        Proceedings held before the HONORABLE RICHARD P.

MATSCH, U.S. District Judge for the District of Colorado,

beginning at 8:29 a.m. on the 25th day of October, 2010 in

Courtroom A, United States Courthouse, Denver, Colorado.

APPEARANCES

For the Plaintiff:       David Lichtenstein, Esq.
                      1556 Williams Street, #100
                      Denver, Colorado  80218

                      N. Nora Nye, Esq.
                      Nye & Associates
                      1556 Williams Street, #201
                      Denver, Colorado  80218

      Proceedings recorded by electronic sound recording;
        transcript produced by transcription service.

APPEARANCES: (Continued.)

For the Defendant:          Jeffrey Alan Springer, Esq.
                            Springer & Steinberg, P.C.
                            1600 Broadway, #1200
                            Denver, Colorado  80202

```
 1                    P R O C E E D I N G S

 2        (At 8:29 a.m. on October 25, 2010, in the United States

 3   District Court at Denver, Colorado, before the HONORABLE

 4   RICHARD P. MATSCH, U.S. District Judge, with counsel for the

 5   parties present, the following proceedings were had.)

 6        (Whereupon, jury voir dire was previously transcribed,

 7   and is not included herein.)

 8        THE COURT:  Be seated, please.  Okay.

 9        (11:28 a.m. - Jury present.)

10        THE COURT:  All right, members of the jury, I ask at

11   this time that you stand, raise your right hands, and take

12   the oath as the jury for this trial.

13        (Whereupon, the jury affirmed the oath.)

14        THE COURT:  Please be seated.

15          Now, as I told you, we will begin with opening

16   statements of counsel.  By way of introduction, one thing I

17   instruct you about is that we don't permit note taking by the

18   jury in the course of the trial.  That may seem odd to you

19   because you see other people taking notes, including me, but

20   there are 12 of you that will decide this case based on your

21   collective recollection of the testimony presented to you in

22   the course of the trial.  Exhibits, of course, will be given

23   to you, the exhibits that are received.

24          But, the fact is that note taking, it is very

25   difficult to take notes unless you're very experienced at it,
```

1    and there's a natural tendency to try to get everything down,

2    and you can't do that.  And, what often occurs is that you're

3    behind, the witness is testifying to something, and you're

4    still taking notes on something said earlier.  It's important

5    that you observe the witnesses, they'll be seated in this box

6    right across from you, as they testify because part of what

7    you rely on in determining what you think about their

8    testimony is the way in which they testify.

9         So, anyway, we're going to start, and, of course,

10   the plaintiff starts first.  So, Mr. Lichtenstein, you may

11   proceed with your opening for Mr. Lederman.

12     MR. LICHTENSTEIN:  Thank you, Your Honor.  Good morning

13   again, Ladies and Gentlemen.

14        When you run a business, you should know the

15   overtime laws.  And, if you know your workers are earning

16   overtime, you should keep track of the time that they're

17   putting in.  And, if you don't understand the overtime laws,

18   you're responsible if you don't follow those laws.

19        Now, let me tell you the story of this case.

20   Frontier Fire Protection was started about 50 years ago by

21   two men, Karl Smith and Herb Tower.  Mr. Tower died about 40

22   years ago, and Mr. Smith became the president, CEO and sole

23   owner of the company.  As you heard from Judge Matsch, Mr.

24   Smith passed away last year.  He was in his eighties, but

25   until he did, he controlled the company right down to

1   approving time off and approving time sheets.

2          Again, Frontier is in the automatic sprinkler
3   system business.  Most of their customers are contractors.
4   They work at box stores, they put in sprinklers at schools
5   and offices.  Their business usually comes from general
6   contractors that they've dealt with before, repeat business,
7   contractors whose names you may have been around town.  You
8   will hear from a couple of them in this courtroom.  These
9   contractors come back to Frontier because of their reputation
10  for performance and for service.

11         Frontier, in 2002 when this story begins, had about
12  60 to 100 employees, depending on the seasons, more during
13  the high summer construction season.  All of them work
14  through design, make and install sprinkler systems.  An
15  important job at Frontier is the estimator.  The way this
16  works, some of you already know, the contractors may want to
17  bid on a project.  What they do is they go to the
18  subcontractors that they're going to need to do the project.
19  They ask the subcontractors to prepare bids, so that the
20  contractor's bid to the owner can be the most competitive
21  possible bid.

22         Lots of contractors have lists of subcontractors
23  that they have confidence in and they know they want to
24  invite to bid.  So, they'll put calls out in many cases to
25  the subcontractors and say we've got a project going, we want

1   a bid from you, you've got, say, a couple weeks to get your

2   bid done and get it back to us.

3          The estimator is the guy that puts the bid

4   together.  I say guy, in most cases, it is.  What he does is

5   he takes the construction plans and specifications that he

6   gets from the general contractor, takes them into his office,

7   he figures out a design, at least a preliminary design for

8   the fire sprinkler system, he computes the amount of labor,

9   the amount of materials that are going to go into the job,

10  creates a spread sheet, comes up with a price.  The price is

11  critical, obviously.  If it's too high, you don't get the

12  job.  If it's too low, you don't make a profit.

13         In the case of Frontier, many bids were often taken

14  to the owner of the company, Mr. Smith, for his approval.

15  And, then, finally, after all the work is done to put the bid

16  together, it's faxed, sent back to the contractor in some

17  way.  It's a complex and time-consuming process, and you're

18  going to hear much more about it in the course of this case.

19         Now, back in 2002, most, or even all, of the

20  employees of Frontier were hourly employees.  Most of them

21  were installers that were in a union.  But, just about all

22  employees of Frontier, if they worked overtime, worked more

23  than 40 hours a week, received overtime pay.

24         Mr. Martin, here at the table, vice-president of

25  operations, knows that there were overtime regulations, and

1   Mr. Smith, through his deposition testimony that you will

2   hear in this courtroom, will tell you that anyone in business

3   knows about overtime laws.  But, there's one employee at

4   Frontier that does not get overtime.  That's the estimator.

5   You may wonder what's Frontier's reason for not paying the

6   estimator overtime.  Well, until this case started, they

7   didn't have one.  Mr. Smith just said we don't pay it.

8           In early 2002, Frontier needed an estimator.  There

9   was also word on the street that Mr. Smith might be

10  interested in selling the business.  So, there was a

11  gentleman who had experience with fire sprinkler companies,

12  he worked in New York State, he worked in Florida, and worked

13  a little bit in Colorado.  He had spent the last year and a

14  half before that with a smaller fire sprinkler company called

15  Diamond.  That gentleman was Gary Lederman.  He got together

16  a couple of friends who had money to put an offer together to

17  buy Frontier, and nothing came of it.  But, Mr. Smith did get

18  Mr. Lederman interested in working at the estimator position.

19          Soon, there was an agreement with Frontier to hire

20  Mr. Lederman.  The deal was Mr. Lederman would get $30.50 an

21  hour for a 40 hour week.  That was the same amount he was

22  making at Diamond.  But, what made the job at Frontier

23  interesting enough for Mr. Lederman to make the switch was

24  the added responsibility, participation in a profit sharing

25  plan, and the opportunity to make bonuses.  Mr. Smith told

1   Mr. Lederman that he routinely gave year-end bonuses to

2   estimators.  Mr. Lederman would also get a company car, which

3   was standard issue for estimators at Frontier, and an

4   allowance toward his health insurance.

5          You may be thinking gee, that's a lot of money to

6   pay somebody.  But, estimators are hard to come by, and

7   Frontier's people will admit that.  Mr. Lederman was

8   experienced and a hard worker.

9          Well, there was no time clock at Frontier.  What

10  they did instead was they had paper time sheets, and every

11  employee at the company would fill in a weekly time sheet and

12  turn it in at the end of the week.  Mr. Lederman quickly

13  found he was working well in excess of 40 hours a week, so he

14  would write down on his time sheet the number of hours he

15  worked, 48 hours, whatever it was, and he would turn it in.

16  And, he would get the time sheet back from the accounting

17  department, and he would be told you can't turn in that time

18  sheet.  Mr. Smith won't accept a time sheet that has more

19  than 40 hours on it from you.  Mr. Lederman asked the reason,

20  and he was told Mr. Smith just doesn't pay overtime.

21         So, what Mr. Lederman did instead was to go home

22  and enter on his home computer the time that he was working

23  at Frontier.  He had a little spread sheet which you will see

24  more of in this case.  He put down his daily hours.  Now, he

25  didn't turn those in because he knew there was no point in

 1   doing that, but it was no secret that he was working more

 2   than 40 hours a week.  He would be in early.  He would leave

 3   late.  Mr. Martin would see him.  Mr. Smith would see him.

 4   He even had an alarm code so that he could get himself in or

 5   out of the building when no one else was there.  This went on

 6   for years, and there were many times that Mr. Lederman raised

 7   the issue of overtime with Mr. Smith and Mr. Martin.  And,

 8   there are going to be arguments in this courtroom about how

 9   many hours Mr. Lederman was actually working.  But, Mr.

10   Lederman was the only one that was keeping track.

11          Early on, he suggested well, maybe I can bank my

12   extra hours, and I can get some extra vacation time.  But,

13   soon, Mr. Smith and Mr. Martin decided that was too much

14   trouble.  They thought about maybe letting Mr. Lederman

15   charge for his overtime.  But, once they got one or two

16   sheets with overtime on it, they decided that this was just

17   too much overtime to pay him.

18          Finally, in early 2006, things came to a head.  Mr.

19   Lederman sat down with Mr. Martin and Mr. Smith and Mr.

20   Koslowski, another manager at the company, and Mr. Smith

21   finally was persuaded to let Mr. Lederman have an extra six

22   personal days a year.  But, Mr. Lederman was working far more

23   than that in overtime.  He figured it was as good as it was

24   going to get, so at that point, he stopped keeping track on

25   his home computer, and he finally left the company in May of

1   2007.

2         Now, you heard Judge Matsch tell you that the

3   defendant's claim in this case is that Mr. Lederman was an

4   exempt outside salesman.  And, it is true that there is an

5   exemption in the overtime laws, one of many exemptions, for

6   outside sales people.  Now, you may have an idea in your head

7   about what that means, but it's very important for you to

8   understand that there's a very technical legal term.  And,

9   you're going to hear a lot more at the end of this case about

10  exactly what that means.  Mr. Smith will use the term in his

11  deposition testimony.  Others may use it in this courtroom as

12  well.  But, again, at the time, all that Mr. Lederman was

13  told was he just doesn't pay overtime.

14        You will hear a lot about how much time Mr.

15  Lederman spent in the office.  Mr. Smith will admit to you

16  through his deposition testimony that there was a long list

17  of tasks that estimators did that were central to their job

18  as an estimator, and that had to be done in the office.

19        But, by the same token, Mr. Lederman is not going

20  to deny that there were situations where he had the chance to

21  show Frontier's best face to some of the customers.

22  Sometimes, those chances were outside of the office.

23  Sometimes, the job would be down to two or three bidders, and

24  they were all pretty low, and a contractor may want to talk

25  to all of the low bidders.  Mr. Lederman would not miss an

 1   opportunity to try and cajole the contractor into taking

 2   Frontier's bid more seriously than the others.

 3        There were other times that Mr. Lederman at the

 4   beginning of a job, when he was told that Frontier was

 5   invited to bid, would go out to the contractor's office and

 6   pick up the plans.  And, he would look for a chance to get

 7   some face time with some representative of the contractor.

 8   But, most of his time was not spent outside the office trying

 9   to drum up business.  In the end, he always came back to the

10   office, and always had to put that bid together and do the

11   work at his desk with those plans in his office, pour over

12   them, work on designs, put the spread sheets together, and

13   come up with that bid.

14        Another thing Mr. Lederman is not going to deny is

15   that he spent a lot of time driving, and there's going to be

16   a lot of talk in this courtroom about mileage logs that were

17   generated at the end of the year.  And, he did put a lot of

18   miles on his company car.  But, often, he was driving for

19   work that wasn't even estimator work.  He was expected to do

20   whatever the company told him to do.  He was a skilled guy.

21   He was the kind of person that was dedicated and did what he

22   was told to do.  So, a lot of his trips in his company

23   vehicle were to what are called construction coordination

24   meetings.  These are meetings that were convened after the

25   bid had already been awarded to Frontier.  The contract is in

1   place, and now the contractor is gathering its trades people

2   to make sure everyone is on the same page, timing of

3   construction is going to go the way they want it to.  These

4   trips took Mr. Lederman all up and down the Front Range, and

5   even up in the mountains.

6          Yet, most of Frontier's business was repeat

7   business.  It was not Mr. Lederman's job to go out and hustle

8   new customers.  He didn't have a sales schedule.  He didn't

9   have a sales kit.  He didn't get sales training.  In fact,

10   Mr. Smith even complained that Mr. Lederman wasn't in the

11   office enough.  And, his successor, a gentleman by the name

12   of Todd Feneis, who is now the estimator at Frontier, says

13   that he spends about 80 percent of his time in the office.

14          We are suing Frontier because it didn't follow the

15   federal overtime laws, because Mr. Lederman often put in ten

16   hours or more of overtime every week that he wasn't paid for.

17   He wasn't even given a way to tell the company on a regular

18   basis how many hours he was putting in.  The company refused

19   its responsibility to pay Mr. Lederman his overtime.

20          At the end of the trial, we expect that Judge

21   Matsch is going to ask you about the hours that Mr. Lederman

22   put in, and we expect, as he's told you this morning, that

23   you will be making your decision on the law and the evidence,

24   and that he will tell you that the only thing you should take

25   into account in this case is the actual overtime hours that

1  Mr. Lederman worked that he was not paid for.  You won't be

2  asked whether the amount that he already received for the

3  work he did at Frontier was too high, or even too low.

4          So, when we tell you about the hours that Mr.

5  Lederman put in without being paid, we're not trying to get

6  your sympathy.  We're doing this because this is the evidence

7  we're required to give you so you can do your job.

8          Now, we do all agree that Mr. Lederman is not

9  asking for anything before August of 2004.  But, by the end

10 of this case, you're going to understand why the evidence

11 presented to you makes this the kind of case where I'm going

12 to have to come back and ask you for an amount of money or

13 hours, that when I tell it to you now, may seem high, but Mr.

14 Lederman is going to tell you that based on the hours that he

15 put in over a three year period, nearly 1200 overtime hours,

16 he's entitled to another $60,000 for losses that were caused

17 as a result of Frontier's failure to follow federal overtime

18 law.

19          Thank you.

20    THE COURT:  All right, members of the jury, you heard

21 from the plaintiff's side of the case.  We'll hear now from

22 Mr. Springer for the defendant.

23    MR. SPRINGER:  Thank you, Your Honor.  May it please the

24 Court.

25    THE COURT:  Counsel.

1       MR. SPRINGER:  Counsel, Ladies and Gentlemen of the

2   jury.  It is now my opportunity to make an opening statement

3   to you, and an opening statement is simply what the lawyer

4   believes that the evidence will show in the case.  It's not

5   evidence.  What I say is not evidence.  What this lawyer says

6   is not evidence.  The only evidence in this case will come

7   from the witness stand, and from the exhibits that His Honor,

8   Judge Matsch introduces or allows to come into evidence in

9   this case.  That's the evidence.  If I tell you something,

10  predict something is going to happen in the case and it

11  doesn't happen in the case, you should ignore what I've said,

12  and rely solely on your collective judgments and wisdom as to

13  what the evidence was in the case.

14          This case is about someone trying to milk the

15  system, and get a bunch of money after the fact, after he was

16  treated fairly and appropriately by a company.  The evidence

17  in this case will show that Mr. Lederman was hired to be an

18  estimator, and an estimator has certain connotation and

19  meaning in the industry of fire protection.  The evidence

20  will show that he worked in this industry for 15 or 20 years

21  as an estimator.  And, what does the estimator do?  The

22  estimator doesn't just make an estimate, because companies

23  don't always hire Frontier Fire or other fire protection

24  companies because they're the low bidder, they hire them, or

25  accept them because they trust them, because they know

1   they'll produce good product, because they know that they'll

2   be there to service the product, because they know that it's

3   somebody they can depend upon.

4          So, what does the estimator do?  The estimates the

5   bid and sells the company, communicates with the contractor

6   or the building company, and goes out and tries to sell a

7   system that gets put into place by Frontier Fire Protection

8   employees who install sprinklers that keep fires from

9   spreading.  And, you will hear that Frontier Fire Protection

10  became a very successful company.

11         And, the evidence will show that Mr. Lederman had

12  done this for years and years, as I said, and he was never

13  paid overtime.  He knew it was a position of sales.  He was

14  an outside salesman.  He never once got paid overtime in all

15  the jobs he had, never demanded overtime, and when he came to

16  work for us, he came in and they negotiated.  He said I need

17  to make what I was making before, and what I made before on a

18  salary basis equated to $30.50 an hour.  And, so, the company

19  wrote on a piece of paper, and I think it will be introduced

20  into evidence in this case, 30.5 times 40 equals whatever, as

21  a salary, and he got paid a salary.  And, then, the company

22  said we'll give you part of the profit sharing plan, and if

23  things go well for us, you can earn a bonus at year end, and

24  we pay significant bonuses.

25         So, Mr. Lederman took this job on, and was going to

1   make in the $80,000 a year range, and worked as an outside

2   sales person for a company that had become a successful

3   company under the ownership and management of Karl Smith.

4          The evidence will show Mr. Smith was a fifth grade

5   drop out, former Marine, started this company in 1960, didn't

6   really have much going for him at the time, except he knew

7   how to work hard and he was honest.  And, before long, he

8   made this into a very successful company, and he became a

9   multi, multi-millionaire, and he was a generous, decent

10  person.

11         And, so, when Mr. Lederman came to him and said,

12  gee, I'm working all these long hours, Mr. Smith, and I think

13  it's uncontroverted, told him we'll hire an assistant for

14  you.  No, no, I don't want an assistant.  Mr. Lederman said

15  to him well, can I bank time so I can go out of town and have

16  personal time?  Mr. Smith said sure, you can do that.  When

17  Mr. Lederman came to him and said, gee, I need to do an extra

18  job on a Saturday, can I get paid extra money for that?  Mr.

19  Smith approved that.

20         Mr. Smith never paid an estimator, and no one else

21  in this industry pays an estimator overtime because they are

22  considered to be outside sales.  Now, how do we know they're

23  outside sales?  Well, when Mr. Lederman came to work, as I

24  said, he knew there was not going to be overtime.  He knew,

25  he'd done this over and over, and he asked for, this wasn't

1    the company, he demanded a large SUV motor vehicle to drive

2    around.  And, so he had a car to drive around, not because he

3    had been sitting in the office all day long, he wouldn't need

4    a car, he got this car to drive around because he had to pay

5    time and attention to customers away from the office, and he

6    did that.

7            And, how do we know that?  Well, you will see in

8    this case, I believe, there will be some evidence of mileage

9    sheets that Mr. Lederman turned in year after year.  And, was

10   he turning in mileage of two or three thousand a year or four

11   or five thousand a year?  No.  You'll see the evidence.  He

12   was turning in business miles of close to 20,000 miles a

13   year.  He was clearly an outside sales person, driving around

14   20,000 miles a year.

15           And, was he a sales person?  They're in here now

16   telling you not a sales person, not a sales person.  I think

17   the evidence will show that when he filed his lawsuit in this

18   case, he started it--you file a lawsuit with a piece of

19   paper, and it's called a complaint.  And, it's what starts

20   the lawsuit, and it gets filed in the United States District

21   Court for the District of Colorado, this district.  And, in

22   the lawsuit, Mr. Lederman characterized himself as a

23   salesman.  So, he knew he was a salesman.  The evidence will

24   show he was an outside salesman.

25           The evidence, in fact, will show that he went

1   around the state, Vail, Colorado Springs, different places in

2   the state to sell the system, to sell Frontier Fire.

3        And, we believe the judge, His Honor Judge Matsch,

4   at the end of the case will instruct you that if somebody is

5   regularly and customarily, not always, not every minute, not

6   a certain percentage, but regularly and customarily engaged

7   away from the place of business as a sales person, then they

8   are exempt from overtime.  And, we believe the evidence in

9   this case will demonstrate that Mr. Lederman was an outside

10  sales person, exempt from overtime.  And, we believe the

11  evidence will show--we don't have to prove this--that he's

12  concocted this whole thing.

13        He started off when he, the evidence will show when

14  he quit, he came to Mr. Smith and quit in 2007, Mr. Smith

15  paid him three weeks vacation.  Mr. Smith had paid him a

16  $40,000 bonus in 2006, year-end bonus.  That wasn't good

17  enough for Mr. Lederman, because he then got a lawyer and the

18  lawyer wrote a demand and said you pay us more of a bonus.

19  Even though I'm quitting in the middle of the year, I demand

20  a bonus for 2007, and I might sue you--I'm going to sue you

21  for that, and I'll sue you maybe even for overtime.  That was

22  like an after thought.  And, the evidence will show Mr. Smith

23  said that's not the way I do business.  You're not entitled

24  to a bonus.  It's a year-end bonus.  You quit, and I'm

25  certainly not going to pay overtime when you weren't entitled

1   to overtime.

2          Now, we're going to be here at the end of this

3   case, and I'm going to stand up and I'm going to ask you on

4   behalf of Mr. Smith, who is deceased, he worked every day at

5   Frontier Fire, he worked until the day he died at Frontier

6   Fire at the age of about 86 last year, and I'm going to ask,

7   on behalf of Mr. Smith and on behalf of Frontier Fire, that

8   you not let somebody gain the system, that you not award

9   overtime.  Mr. Smith was a generous person.  The evidence

10  will show when he died, he gave the company to Kenny

11  Koslowski, who may be here tomorrow, and Steve Martin, who is

12  here today.  He didn't sell it to them.  He gave it to them

13  because they had worked for years for him, they were loyal

14  and dedicated, but he wasn't going to pay overtime to

15  somebody who wasn't entitled to it.

16          Thank you.

17  THE COURT:  All right.  Members of the jury, you will

18  now understand a little more about our dispute, why we're

19  here, why you're here, and we'll proceed next to the taking

20  of the evidence in the case.  Given that it's almost noon,

21  we'll take our noon recess, and we'll come back and we'll

22  start hearing from the witnesses then at 1:15.

23          So, we'll recess now until 1:15.  I, again,

24  emphasize two things.  One is, as counsel have told you, what

25  they say in opening statements is not to be taken as

1    evidence, but what they expect the evidence is to be and what

2    their respective positions are.  The evidence will be from

3    the witnesses and exhibits.

4            Also, keep open minds.  I restrict you during the

5    time of this trial from discussing the case among yourselves,

6    with any other person, using any--well, just give me an idea.

7    How many of you normally do social networking where you have

8    Face Book, or that sort of thing, just a show of hands?

9    Yeah, thank you.  So, you know, I don't know if they're

10   called friends on Face Book, I guess, and there are a number

11   of other things, but all I'm telling you is that don't do it

12   with respect to the trial itself, or the subject matter of

13   the trial.

14           There have been, just so you understand the

15   importance of this, there have been several cases, not in

16   this court, but in some other courts where after a lengthy

17   trial and a verdict reached, it was discovered that jurors,

18   some jurors, had been using social network means to

19   communicate about the case with other persons not on the

20   jury.  And, also, in two cases that I'm aware of, they went

21   to other sources with their web searches and looked up

22   information that they thought they ought to apply in the

23   case, outside the evidence.

24           Well, in those cases, the jury verdicts were set

25   aside because jurors violated their oath, did receive

1   information outside the evidence in the case.  That's not

2   permitted at a trial.  And, so, those cases had to be tried

3   all over again with a different jury.  So, that's why I'm

4   emphasizing it.  It would be a violation of your oath if you

5   were to do that in this case.

6           So, one thing that occurs, of course, is that

7   certainly you can advise employers and family members that

8   you're on a jury, and that you're here, you know, but you

9   can't talk about the case.  And, if somebody says, well, if

10  you can't tell me what you're doing down there, I don't think

11  you're down there, but you have to explain to them that

12  you're restricted with respect to any communication outside

13  of this room.

14          With all that, members of the jury, we'll excuse

15  you until 1:15, and we'll start the evidence at that time.

16  You're excused.

17      (11:58 a.m. - Jury excused.)

18      THE COURT:  You expect to call the witnesses in the

19  order in which you listed them on the witness list?

20      MR. LICHTENSTEIN:  That's what we're planning, Your

21  Honor.

22      THE COURT:  Okay, good.  Well, we'll recess, 1:15.

23      (11:59 a.m. - Whereupon, the lunch recess was taken.)

24

25

1                     AFTERNOON SESSION

2          (At 1:20 p.m. on October 25, 2010, with counsel for the

3     parties present, the following proceedings were had:)

4          THE COURT:  Be seated, please.  Okay.

5          (1:21 p.m. - Jury present.)

6          THE COURT:  All right, Mr. Lichtenstein, your first

7     witness, please?

8          MR. LICHTENSTEIN:  Thank you, Your Honor.  Plaintiffs

9     call Mike Willingham.

10         THE COURT:  If you'll please--is the witness in the

11    witness room?  Oh, Mr. Willingham, if you'll come forward,

12    please, to the witness box to be sworn?

13                     MIKE WILLINGHAM

14    called as a witness on behalf of plaintiff, having been first

15    duly sworn, was examined and testified as follows:

16         THE CLERK:  Please be seated.  Please state your full

17    name, and spell your last name.

18         THE WITNESS:  David Michael Willingham, W-i-l-l-i-n-g-h-

19    a-m.

20                     DIRECT EXAMINATION

21    BY MR. LICHTENSTEIN:

22    Q    Good afternoon, Mr. Willingham.  And, you go by your

23    middle name, I take it?

24    A    Yes.

25    Q    Would you state your full name and address for the

1    record, please?  You just stated your name.  Your business

2    address, please?

3    A     Okay.  It's--I'm with Maxwell Builders, Incorporated,

4    it's 333 West Hampden Avenue, Suite 325, Englewood, Colorado

5    80110.

6    Q     What is your job title with Maxwell?

7    A     I'm the vice president of operations.

8    Q     And, were you subpoenaed to testify today?

9    A     Yes, I was.

10   Q     Tell us what kind of work Maxwell does?

11   A     We're a general contractor.  We do a lot of commercial

12   work, some multi-family work in the Denver market.  We do

13   commercial renovation work for large national retailers, such

14   as J.C. Penney and Sears.  And, we work across the country

15   doing renovation work for them.

16   Q     Okay.  So, I take it the Denver office is a branch

17   office of some kind?

18   A     The Denver office is the corporate office, or the

19   Englewood office is.

20   Q     Okay.  How long have you been with Maxwell?

21   A     I've been with Maxwell for six years.

22   Q     And, if you would, would you please take us through your

23   educational and professional background briefly that took you

24   to Maxwell?

25   A     Okay, very briefly, my background, I have a degree in

1   architecture, master of architecture, practiced architecture

2   for 14 years in Texas and Louisiana.  I worked for a number

3   of companies, construction companies following that, in

4   Chicago as the director of construction for Montgomery Ward

5   up until 1995.  In 1995, I moved to Colorado to work for a

6   large retail construction company here called RAS Builders.

7   I was with that company for almost ten years, up until their

8   closure, and for the last six years, I've been with Maxwell.

9   Q   So, what did you do for RAS?  What was your--

10  A   I was vice president of operations for the Denver

11  office, and then handled national accounts for the last two

12  years I was with the company, we had eleven offices across

13  the country.

14  Q   And, why don't you give us just a quick thumbnail

15  description of your current job duties?

16  A   Currently, I'm responsible for all the project

17  management and field supervision for all the projects we do,

18  in addition to operations within the corporate office itself,

19  manage a staff of 22 people currently, 12 of those are field

20  superintendents.  We don't really self perform any work, we

21  subcontract all of our work out, so we provide project

22  management services.

23  Q   Now, does Maxwell do business with Frontier Fire

24  Protection?

25  A   We have.

1   Q     Okay.  What kind of projects have you done where

2   Frontier has been the fire sprinkler company?

3   A     I believe in all the projects we've done, with one

4   exception, have been tenant finish projects, retail projects.

5   I think the first project we did was in 2006.  It was a

6   conversion of a Toys R Us store into a Best Buy facility, and

7   they did the fire protection work in that one.  We did a

8   ground up project that was a Checker Auto in 2007 or '08, and

9   a couple of projects for Costco, rather small, tenant finish,

10  remodel work.  And, then, recently we did a project for

11  Pacific Dental Services, which was also a tenant finish

12  project.

13  Q     How recently was that?

14  A     That was last year, 2009.

15  Q     Okay.  So, how does Maxwell get general contract work

16  from a building owner?

17  A     From a building owner?

18  Q     Yes.

19  A     We've competitively bid most of our work.  Very little

20  is negotiated.  We have a lot of national client accounts,

21  however, most of that work is all bid with a select group of

22  general contractors.  So, I would say about 90 percent of our

23  work is what everyone would call a hard bid process, where

24  we're bidding against four or five other general contractors.

25  Q     Okay.  About how many bids do you put in every year?

1   A    We put in several hundred bids a year.  We do anywhere

2   from 50 to 75 projects, a combination of here or throughout

3   the Western United States, and out of those 50 to 75, we'll

4   bid anywhere from several hundred to 400 or 500 projects a

5   year.

6   Q    And, how often do you actually get the contract?

7   A    We're probably 30 to 40 percent successful in our

8   projects.

9   Q    And, in the projects that you bid on, how many general

10  contractors are you typically competing with?

11  A    Normally four to five.  In this market in the past few

12  years, it's been as many as 12 to 15.

13  Q    Okay.  Would you explain to the jury how you put a bid

14  together?

15  A    Since we're a general contractor, we solicit bids for

16  all of the work, subcontract bids.  There will be Divisions 2

17  through 16, which basically covers all of the site work up

18  through the drywall and the plumbing and the HVAC work, the

19  electrical work.  We solicit subcontract bids for each one of

20  those individual elements.  We may solicit 15 or 20 or more

21  subcontractors in each one of those trades.  We assemble

22  those bids as they come in, put together the lowest qualified

23  bidders out of those subcontract bids, and then we submit our

24  bid to the owner.

25  Q    Okay.  Let me back up a little bit.  How do you let

1   subcontractors know that you're looking for bids from them?

2   A    We maintain a list of probably 2,000 to 3,000

3   subcontractors in this market and then throughout the Western

4   states.  Again, we do a lot of national work for larger

5   clients.  We'll send out either e-mail or fax solicitations,

6   or we'll use every once in a while a couple of the plan

7   services, but most of our clients prefer that we don't, so we

8   make direct contacts and we'll send out a broadcast e-mail or

9   fax to our selected subcontractors to determine if they're

10  interested in submitting a bid.

11  Q    Now, if a subcontractor is interested in submitting a

12  bid, do they need to get plans or specifications from you?

13  A    Yes.  Normally, they'll get them from us either in forms

14  of a disk or hard copies of plans.  They may be on file in

15  the few instances where there's actually a plan services

16  involved, a multitude of ways.  Many times we'll distribute

17  plans right out of our office.  We've got our own scanning

18  facilities, so just it varies with the projects.  Sometimes

19  we will print all the copies of the plans, and the subs will

20  come pick them up at the office.  Other times, we may send a

21  courier to their office, or again, sometimes it may just be

22  sending a disk that's got all the drawings and

23  specifications.

24  Q    And, do subs--I mean, who at the subcontractor would

25  typically pick up plans from you if that situation is

1   happening?

2   A    It varies.  We deal with a variety of sizes of

3   subcontractors.  Some of the larger subcontractors may always

4   send a courier.  Sometimes we will actually send the plans

5   out.  We bid work all across the Front Range, so it's

6   everywhere from Fort Collins down to Pueblo, so it's not

7   uncommon that we'll overnight plans.  It may be the estimator

8   that comes into the office to pick up the plans.  Sometimes,

9   there's need to look at the plans and go through the work

10  scope there with one of our estimators.

11  Q    Okay.  Now, you talked about a list of subcontractors.

12  Let's talk specifically about fire sprinkler companies.  How

13  do you decide who's going to be on your list of

14  subcontractors that you'll invite to bid?

15  A    It also varies because we do a wide variety of sizes of

16  projects.  We'll do some projects that are maybe $50,000

17  total contract, not just the fire protection contract, so it

18  may be a relatively small scope of work.  So, we'll try to

19  match the size of those contractors with the project itself.

20  There may be certain of the subcontractors that really don't

21  feel competitive or don't like to do smaller projects, just

22  because it's more labor intensive for less amount of money.

23  Some of the larger projects appeal to a broader range of the

24  larger subcontractors.

25  Q    And, how many sprinkler companies are typically on your

1   list?

2   A    In our total list?

3   Q    Yeah.

4   A    We would probably have--I'm not the right person to ask

5   that question, but probably I would say more than 50 in this

6   market that covers that whole Front Range area.  At any one

7   point in time, we may solicit 15 or 20 to see if they've got

8   an interest in bidding.

9   Q    All right.  And, of those 15 or 20, how many actually

10  will typically respond with a bid?

11  A    It varies upon the time of the economy.  We've had times

12  where we've had a dozen sprinkler bids that come back in.

13  Other times, we may get one or two.

14  Q    All right.  Is it important for subcontractors to get

15  bids into you quickly?

16  A    Yes.  Everything works on a bid time clock.  We normally

17  let the subs know that we have to have our numbers in from

18  them the day before our bid so that we can assemble those

19  bids, get them put together in one coherent bid that goes in

20  from us to the owner.

21  Q    And, how is the bid usually transmitted from the

22  subcontractor to you?

23  A    It's either an e-mail or a fax bid.  Rare occasions, a

24  sub will hand deliver a bid to the office, but these days,

25  that's just not the case.

1   Q     All right.  Then, how do you in turn decide which of the

2   bids from a subcontracting trade you're going to accept?

3   A     As far as accepting in total, or accepting as a low

4   bidder?

5   Q     Well, accepting as a low bidder.

6   A     Okay.  Again, we pre-qualify the subcontractors, so that

7   before we invite somebody, we already feel comfortable that

8   they are capable of doing the work.  The lowest qualified

9   bidder is the one that we'll work with then as we put that

10  into our numbers to submit to the owner.

11  Q     What is it about a company that makes you feel

12  comfortable that they're qualified?

13  A     Prior experience with the same type project.  Sometimes

14  just the capabilities of the firm.  We want to look for

15  financial stability of the firm, just as our clients look to

16  us for the same thing.

17  Q     Okay.  So, you've got all these bids from

18  subcontractors.  What do you do with them?

19  A     Normally, bid time is a set time.  We've got to have our

20  bids either faxed or e-mailed, and then sometimes hand

21  delivered to our owners at a specific date and time.  Many

22  times the subcontract bids are being faxed or e-mailed into

23  us, also many times they come in 15 minutes before our bid

24  time, so there's generally a scramble at the last minute to

25  try to make sure that you can sort through, you can qualify,

1   you can clarify, sometimes you have time to call the

2   subcontractors individually and make sure that they've got

3   the right bid scope, make sure that they've got the right

4   numbers, that they've got the right quantities.  Then, once

5   you've finished qualifying those, again, the lowest qualified

6   bidder is the one that goes in as our number for a specific

7   sub-trade.

8   Q     What do you mean by making sure they have the right bid

9   scope?

10  A     Bid scopes can vary a lot, especially if you're doing

11  remodel and tenant finish.  If a building is built new ground

12  up, it's relatively clear sometimes with the plans, depending

13  on the quality of the plans.  But, especially for

14  renovations, you have to make sure that the, not just every

15  subcontractor, but that we ourselves have got a good clear

16  understanding of what the scope is of what's to be perhaps

17  demolished to come out for new work to go in.  If they're

18  leaving a certain portion of the work intact and we're adding

19  onto it, we want to make sure that we don't have too much

20  scope in there, or not enough.

21  Q     Okay.  Now, do you ever call the subcontractors who sent

22  you bids and say okay, you're the low bidder, we're going to

23  put your bid in with the big bid that we're sending to the

24  owner?

25  A     Usually before the bid time, you're scrambling just to

1    try to make sure that you've received those bids, that you

2    get them all entered and you make sure that they're

3    qualified, that they have the right scope.  We very rarely

4    will have a chance to go back to a sub and let the sub know

5    before we put a bid into the owner that they are the low

6    bidder.

7    Q    Okay.  I'm talking about after you put the bid in to the

8    owner.

9    A    After the bid has gone in, generally, because we bid so

10   many projects and because we have so many subcontractors

11   we're working with, our estimating department doesn't

12   necessarily have a chance to call everyone back and let them

13   know where they stand until we've been awarded the contract.

14   If we've been awarded the bid, then we go back through to

15   make sure that we've been clarified everybody, that's when

16   that low bidder will receive a phone call.

17   Q    Okay.  Now, is the bid the same as the subcontract?

18   A    Generally, yes.  What we want to do is to go through

19   again one last time before we award a bid, make sure that

20   they're comfortable with their work scope, and the

21   clarifications, that they've got everything included within

22   there.  There may be times that two work scopes of different

23   subcontractors overlap, so we want to make sure that, say,

24   between the electrical and the HVAC contractor, that the

25   control wiring is in there and one or the other doesn't have

1    it excluded.  So, there may be times that you then add scope

2    to a subcontractor's subcontract before you issue it, and

3    there may be other times that they've got something in there

4    that you determine that they don't need.  So, there might be

5    a variance between what their original bid was and what the

6    final subcontract is.

7    Q    Okay.  I guess that wasn't a very good question.  If

8    you've got a low bid and you know you're okay to go with it,

9    do you just like scribble accepted on it and send it back?

10   A    Sometimes it may be that simple.  Other times, there may

11   need to be still clarifications.  So, that it may not be just

12   as black and white as that.

13   Q    Is there some other paperwork that has to be executed

14   before they actually become a subcontractor on the job?

15   A    Sometimes, we'll issue a letter of intent, if there is

16   an urgency to get the project started before we've had time

17   to actually issue a subcontract.  But, normally, once we've

18   agreed on their subcontract amount and we've awarded it to

19   them, then we'll proceed with the contract, and the contract

20   goes out usually within a week or so.

21   Q    Okay.  So, is the contract a separate document from the

22   bid?

23   A    Yes, absolutely.  We issue a subcontract agreement

24   that's a standard AGC document, modified for our use, and

25   then we'll enter into a contract with the owner for our

1   services.  But, then, we have individual subcontract

2   agreements with each and every subcontractor.

3   Q     Okay.  You said AJC?

4   A     AGC, Associated General Contractors.

5   Q     Okay.  I mean, how long is this contract?

6   A     It's 23 pages, plus attachments.

7   Q     Okay.  How long is the bid that you got from the

8   subcontractor?

9   A     The bid might be one page, it might be 10 or 15 pages,

10  depending on how detailed they are and how they elaborate on

11  their work scope.

12  Q     Okay.  Have you had an opportunity to look at the

13  subcontractors, the AGC documents that Maxwell has executed

14  with Frontier?

15  A     I pulled either five or six copies and brought them with

16  me.

17  Q     Okay.  And, who signs those on behalf of Frontier?

18  A     I think all of the ones that I've got--hang on one

19  second--Steve Martin.

20  Q     Did you ever see a contract that was signed by Mr.

21  Lederman?

22  A     No.

23  Q     Or any other estimator at Frontier?

24  A     I don't know that I would be able to name any other

25  estimators at Frontier.

1    Q    Okay.  Now, does the scope of work ever change after

2    you've got this contract in place with a subcontractor?

3    A    Once we've issued a subcontract and the work has

4    actually started, the project sometimes will have a work

5    scope change, so a change order will be issued.  We'll issue

6    a request for a change order or pricing for that.  Normally,

7    change orders come about through three different ways.

8    Either the owner, our client, makes a change in that work

9    scope and requests a change.  We may run into hidden

10   conditions in a project where we're doing a renovation, so

11   there's work scope there that no one could identify before

12   the bid.  Or, you may have a city official or a building

13   inspector that requests something that wasn't included in the

14   plans.  So, one of those three items could generate a change

15   order, at which time either the subcontractor would come to

16   us with a request for that change, and we would submit that

17   to the owner, get approval and the work is done and then we

18   issue a change order to the contract.

19   Q    So, how does that come about?  You've got a contract

20   with Frontier, they've signed the contract, and now you need

21   a change order, so what happens then?

22   A    Again, once the change order comes to us with their

23   price on it, we will agree to the price or work with them to

24   make sure they've got the same scope, because it's an

25   amendment to the contract, so it's the same premise.  We want

1   to make sure that we've clarified that.  We then present it

2   to the owner.  If the owner approves that, we pass that back

3   through to the subcontractor with a change order to the sub.

4   They're issued an actual change order document signed by them

5   and by us that amends their contract for that amount of work.

6   Q     Okay.  Did you ever get into a dispute with

7   subcontractors over the change order amount?

8   A     All the time.

9   Q     All right.  What happens then?

10  A     Hopefully, you reach a compromise.  Hopefully, there's

11  not too many disputes.  Again, those change orders only come

12  about through three different basic ways.  So, if there truly

13  is work that wasn't identified on the plans and

14  specifications, then we will represent that subcontractor

15  back to the owner to make sure that not only they get paid

16  for doing the extra work, but we do also.  There may be times

17  that a subcontractor gives us a price back and we look at it

18  and you want to get enough detail so that they can tell you

19  exactly what was included in that change.  Just because

20  somebody forgot something in the bid, if it was in the plans

21  and specifications, that doesn't require a change order to

22  the work.  So, we want to make certain that what we are

23  actually paying for, and that the quantities and the numbers

24  within there equate to what that additional work was.

25  Q     Okay.  Now, this negotiation of change orders, how does

1   that take place?

2   A     Normally, the subcontractor will have, and depending on

3   the size of the subcontractor, there may be a project manager

4   who is a counterpart to our project manager, and those

5   negotiations go back and forth between those two.  Sometimes,

6   it's between the subcontractor's estimator, and they will

7   submit a detailed estimate for this additional work.  It goes

8   to our project manager, he may bring our estimator into it to

9   review it and just make sure that we've got the right costs

10  and the right quantities.

11  Q    So, when you get information from the estimator for the

12  subcontractor, how does that get transmitted to you?

13  A     Fax or e-mail.  E-mail is the most common.

14  Q    Okay.

15  A     And, it may have a number of sheets of backup with

16  quantity take-offs.  From a fire protection standpoint, it

17  may be pipe, it may be man hours, equipment rentals that are

18  involved in this particular change.

19  Q    Okay.  Now, I asked you earlier how a fire sprinkler

20  company, for example, can get on your list.  How can a

21  subcontractor be sure that they're going to stay on your

22  list?

23  A     As long as people provide the quality of work for a good

24  price for us, again, we're in the business of working with a

25  lot of clients on a national basis, whether we're doing work

 1   for them here locally, or whether we're working in any of the

 2   Western states.  It's very important to us to maintain those

 3   client relationships.  And, so, repeat work is critical to

 4   us, just as it would be critical to a subcontractor to keep

 5   doing business.  What we want to do is to establish a good

 6   working relationship, and through the best prices, somebody

 7   who's out there who's paying attention to it and who is

 8   concerned about the quality and the cleanliness of the job

 9   site, just like we are.

10        MR. LICHTENSTEIN:  Thank you.  No further questions.

11        THE COURT:  Is there any cross?

12        MR. SPRINGER:  Yes, Your Honor.

13        THE COURT:  Please.

14                      CROSS-EXAMINATION

15   BY MR. SPRINGER:

16   Q    Good afternoon, Mr. Willingham.

17   A    Good afternoon.

18   Q    I introduced myself to you as you were sitting in the

19   gallery just a few minutes before we started.  Do you

20   remember that?

21   A    Yes.

22   Q    And, as I told you, I'm Jeff Springer and I'm an

23   attorney and I represent the late Karl Smith and Frontier

24   Fire.  You and I have never spoken or met before today, have

25   we?

 1   A     Not that I know of.

 2   Q     Now, you do know Mr. Lederman, don't you?

 3   A     Yes, I do.

 4   Q     And, would you consider Mr. Lederman a friend of yours?

 5   A     Yes, I would.

 6   Q     And, you've known him over the years?

 7   A     I've probably known him for ten years, or so, maybe

 8   more.

 9   Q     And, did you know him because he was in the fire

10   protection business providing estimates?

11   A     Actually, I first met him whenever he first moved to

12   Denver and he was working for a millwork subcontractor, and

13   also doing estimating, but heading up operations for them.

14   Q     And, then, did you know him when he went to do

15   estimating for a fire protection company?

16   A     Yes, I did.

17   Q     And, then, you knew him when he left that company and

18   went to work for Frontier Fire?

19   A     Yes, I did.

20   Q     And, you developed, over the years, if I can use the

21   word, a friendship with him?

22   A     Correct.

23   Q     You've seen him other than today, you've seen him on

24   past occasions, haven't you?

25   A     Yes.

1  Q    A number of times?

2  A    Yes.

3  Q    And, I know you indicated that what's important in the

4  bidding process is that the bidder be competent, and low, or

5  close to the low bid; right?

6  A    Correct.

7  Q    And, I think you said, if I heard you correctly, that

8  you want to make sure that the bidder also has financial

9  responsibility; correct?

10 A    Stability, I believe I said.

11 Q    I'm sorry?

12 A    I believe I said stability.

13 Q    Okay, I'm sorry.  But, has the financial resources and

14 ability to actually do the job if they get the low bid;

15 correct?

16 A    Correct.

17 Q    And, you get that information in a number of different

18 ways, don't you?

19 A    We have prequalification forms that subcontractors will

20 fill out whenever they first start doing work with us.

21 Q    And, including somebody like a Frontier Fire has a

22 number of, along with a number of other bidders, requires you

23 to conclude in your own mind that they're going to be a

24 responsible contractor; is that fair?  Is that correct?

25 A    Correct.

1    MR. SPRINGER:  Your Honor, may I approach the witness?

2 He's brought with him today some contracts.  I've never seen

3 them.  I'd just like to look at them quickly.

4    THE COURT:  All right.

5    MR. SPRINGER:  Thank you, Your Honor.

6    (Pause.)

7 Q    (by Mr. Springer)  I think those contracts were signed

8 by an owner of Frontier Fire, or somebody in a position other

9 than Mr. Lederman's position; is that correct?

10 A    That's correct.

11 Q    Now, you didn't bring with you the estimates.  Do you

12 know who would have signed off on the estimates or the bids?

13 A    I don't believe I've got copies of the bids, but I do

14 have copies of quotations for change order requests.

15 Q    Would Mr. Lederman sign off on bids from time to time,

16 to your knowledge?

17 A    I couldn't say about the bids themselves.  I would

18 assume he did.  Again, the estimates for change order

19 requests were submitted by Gary.

20 Q    Now, to your knowledge, are you one of many different

21 contractors that Frontier Fire has contracted with--

22 A    Yes.

23 Q    --over the years?  And, you have a special kind of

24 construction niche, don't you, so to speak?  In order words--

25 A    We are a little bit of a niche contractor.  We do a lot

1  of renovation work, open store remodeling, and a lot of

2  retail work.

3  Q    If someone, if you're asking for a bid, do you tell the

4  subcontractor that they cannot come to the job site, or are

5  they allowed to come to the job site?

6  A    Before submitting a bid?

7  Q    Yes, so that they can look at it?

8  A    Many times, there are pre-bid job walks.  Again, if it's

9  a remodel, it's generally a necessity that someone comes to

10 the job site to see the existing conditions.

11 Q    So, if you're going to do a remodel and you're inviting

12 people to come bid, they'll go to the job site to take a look

13 at the remodel so that they can tailor their bid to that

14 particular project; is that fair?

15 A    Correct.  It's usually a coordinated pre-bid meeting

16 with ourselves and multiple subs on the job site.

17 Q    And, that's a regular part of what you do in your

18 business, isn't it?

19 A    It normally is.  Not every project, but more projects,

20 we do.

21 Q    Now, one last question.  Have you ever met with Mr.

22 Lederman's lawyer before?

23 A    Yes, we did meet one time last week.

24 Q    And, where was that meeting?

25 A    At my office.

1  Q    And, was the lawyer by himself, or did he come with

2  someone?

3  A    Yes.

4  Q    And, you met with him to talk about your testimony?

5  A    Just to get the clarifications on being here today.

6       MR. SPRINGER:  All right, thank you.  No further

7  questions.

8       THE COURT:  Any follow-up question?

9                        REDIRECT EXAMINATION

10 BY MR. LICHTENSTEIN:

11 Q    I just want to be clear.  What exactly is happening at

12 these pre-bid job walks?  What is the purpose of those walks?

13 A    Once we receive plans to bid on, we want the

14 subcontractors and all the bidding subcontractors to have a

15 chance to look at the project.  Sometimes if it's a brand new

16 construction for a new ground-up building, there's nothing

17 really to look at at a pre-bid, so they're bidding it based

18 on the plans and specifications.  I think I mentioned before

19 whenever we're doing a remodel, the concern about having the

20 scope correct is very important, so we like for the

21 subcontractors, and there may be three or four fire

22 protection contractors, three of four electrical

23 subcontractors, we want them all to walk through the existing

24 space with us so they can see what those existing conditions

25 are before they prepare their bids.

1          MR. LICHTENSTEIN:  Okay, thank you.

2          THE COURT:  Is the witness to be excused?

3          MR. SPRINGER:  Yes, Your Honor.

4          THE COURT:  All right, you may step down.  You're

5    excused.  Next, please?

6          MR. LICHTENSTEIN:  Plaintiffs call Gary Lederman.

7          THE COURT:  If you'll come forward to be sworn?

8                         GARY LEDERMAN

9    called as a witness on behalf of plaintiff, having been first

10   duly sworn, was examined and testified as follows:

11         THE CLERK:  Please be seated.  Please state your full

12   name, and spell your last name.

13         THE WITNESS:  Gary Lederman, L-e-d-e-r-m-a-n.

14                      DIRECT EXAMINATION

15   BY MR. LICHTENSTEIN:

16   Q    And, what is your address?

17   A    162-A Calmian (phonetic) Plaza in Monroe, New Jersey.

18   Q    How are you employed at this time?

19   A    Excuse me?

20   Q    How are you employed at this time?

21   A    I'm a senior sales manager for Fire and Croker

22   (phonetic).

23   Q    What kind of company is that?

24   A    We sell fire equipment to the different fire protection

25   contractors.

1    Q    Okay.  Would that be contractors like Frontier, for

2    example?

3    A    Yes.

4    Q    Okay.  And, where is your company headquartered?

5    A    In Elmsford, New York.

6    Q    Okay.  Why don't you take us through a little more

7    detail with your job duties?

8    A    Currently?

9    Q    Yes.

10   A    I cover approximately five states.  I'm now on the road

11   constantly.  My job is to create customer relations, build

12   customer relations with the different contractors so when

13   they need to purchase equipment that we carry, they would

14   come to us for an estimate or for a quote, and we would give

15   that to them, and then they would go ahead and send in a

16   purchase order to the home office, and we would ship the

17   equipment out of our warehouse.

18   Q    And, how long have you been with Fire and Croker?

19   A    I believe June is three years.

20   Q    All right.

21   A    A little over three years.

22   Q    And, before that, you worked for Frontier?

23   A    Yes, I did.

24   Q    Are you originally from New York?

25   A    Originally, yes.

1    Q    Whereabouts?

2    A    Upstate New York, about 90 miles out of New York City in

3    Sullivan County.

4    Q    And, then, how for did you go in school?

5    A    One year of college.

6    Q    And, any trade school or anything like that?

7    A    I went to a design, sprinkler design school in

8    Philadelphia when I first started in the industry back in

9    1971.

10   Q    So, what was your first job out of trade school?

11   A    I was working for my uncle, who is a plumbing

12   contractor, fire protection contractor.

13   Q    Okay.  How long did you work for him?

14   A    Twelve years.

15   Q    When you say fire protection contractor, what did that

16   company do?

17   A    They designed, installed, maintained fire sprinkler

18   systems.

19   Q    Okay.  Similar to Frontier then?

20   A    Yes, sir.

21   Q    And, what was your job there?

22   A    Well, I started out my first eight, nine months working

23   in the field, actually working on installations.  From there,

24   I went into the office.  After that course that I took, then

25   started doing design, hand design.  I did that for about the

1  first five years I was there, six years, and then the

2  estimator, project manager that was with us left, and I took

3  over his responsibilities as well.

4  Q    Okay.  So, explain what you mean when you say design

5  work?

6  A    Excuse me?

7  Q    When you say you did design for the first five years, or

8  so?

9  A    Every system that's installed is requiring a design to

10  take the what supply that would come in, determine what the

11  pipe sizes were, where the mains would run, where the branch

12  lines would run, where the sprinkler heads would essentially

13  wind up going, and create that design and drawing, so that a

14  fabrication list could be created, and then type fabricated

15  and installed on the job with approval from, at that time, it

16  was insurance companies that did the approval on the

17  drawings.

18  Q    Okay.  And, then, you talked about project management.

19  What's that, in a few words?

20  A    Once the job is designed and drawn and fabricated,

21  someone has to coordinate the efforts with the general

22  contractor, the other trades, electrical trade, plumbing

23  trades, as far as when they would start, coordinating where

24  your material is going, your piping is going, with the other

25  trades so that everything would fit, follow through with any

1   change orders that might be required, and basically follow

2   the job right from the start, right through to the finish,

3   and sign off.

4   Q    Okay.  Would you take us briefly through other jobs that

5   you had then before you came to Colorado?

6   A    How far back?

7   Q    From your uncle's company on forward.

8   A    Okay.  I left my uncle's company and I went to a

9   proposed partnership with another mechanical company not too

10  far from where we were.  It was a father/son company, and the

11  arrangement was to be that I would manage that company and

12  bring them the fire protection expertise, and they were

13  basically plumbers at the time.  The father passed away, and

14  then the son and I just didn't work out, so I went on my own,

15  opened up a company called Champion Sprinkler, also up in

16  Upstate New York, and that was run from 1985 to 1994.  In

17  1994--let me back up.  With Champion Sprinkler, I did

18  everything, I ran the company, I helped design, I helped

19  project manage, even installed pipe at times.

20          Then, I went and tried to move into Florida in

21  1994.  I worked with, oh, probably three or four different

22  fire protection contractors at that time.  A little difficult

23  after managing and owning your own company to go to work for

24  someone else, but I tried it.  And, towards the end of that

25  time in Florida, I actually got out of the fire protection

Lederman - Direct                    161

1   industry for about a year or year and a half, and got

2   involved with a company called SCI, selling funeral plots.

3          In 1999, I believe it was, I left Florida to come

4   to Colorado to manage a friend of mine who had a millwork

5   company.  It was--he had a millwork company and a small

6   general contracting company where he would do certain

7   remodels of stores and malls and stuff for it, and I worked

8   with him about a year and a half managing that company,

9   helping with the estimates and project management, and so

10  forth.

11         At the end of that period of time, I went to work,

12  decided to get back into the fire protection business again,

13  where I felt I had my expertise, and decided to go to work

14  for a small company called Diamond Fire Protection, where I

15  felt that I could work with them and help them get the

16  company growing a little bit, and spent about a year and a

17  half there, when the opportunity to work with Frontier came

18  about.

19  Q    So, how did you find out about Frontier?

20  A    Well, I kind of knew through the fire protection

21  community that Frontier was without an estimator, and that

22  they might be looking for an estimator.

23  Q    Okay.  Was there anything else you heard about Frontier

24  at that point?

25  A    Well, I had heard that they were for sale and that I had

1   some associates that were looking to invest some capital in a

2   business, and I met with them and we determined that if they

3   would put the capital up, that I could manage and do the

4   field operations portion of the business.  And, we contacted

5   Karl Smith, and tried to give him an offer to purchase the

6   business.

7   Q    Did anything ever come of that?

8   A    No.

9   Q    Okay.  So, how did it come about then that you started

10  looking into the estimator position at Frontier?

11  A    Well, when I did meet with Karl and we talked a little

12  bit about my background, he felt that I might be good for his

13  company, that I should call and contact Steve Martin and talk

14  to him about an interview to come to work for Frontier as

15  their senior estimator.

16  Q    And, Mr. Martin was who?

17  A    Excuse me?

18  Q    What was Mr. Martin's title?

19  A    I believe Steve at the time was vice-president.

20  Q    Okay.  Before we get into discussions you had with Mr.

21  Martin at that point, I'd like you to tell the jury a little

22  bit about Frontier.  Now, how many employees did they have at

23  that point?

24  A    When I started in 2002, I would say we probably had

25  between 60 and 85 fitters in the field.  We had a shop crew

1   of about five or six.  We had five or six designers.  There

2   could have been maybe 100 people at the time.

3   Q    And, if you had to describe what the company did in 15

4   or 20 words to somebody, what would you say?

5   A    They're a fire protection contractor, five suppression

6   contractor.  They design, install, fabricate and maintain

7   fire protection systems, all types of systems.

8   Q    What kind of buildings did Frontier install their

9   systems in?

10  A    Almost anything, anything from a warehouse to a high

11  rise to an airline hangar to a retail store and mall, pretty

12  much anything that was required, Frontier had the ability to

13  do.

14  Q    Okay, well, let's talk about your first discussion with

15  Mr. Martin.  Tell us what happened at that meeting.

16  A    We discussed the terms of what I would feel I required

17  to come to work for them.

18  Q    Okay.  Anything else happen?

19  A    You know, we talked about how much compensation I would

20  get, some of the benefits of coming to work for Frontier,

21  whether it be bonuses, profit sharing, company car, any of

22  that type stuff that would entice me to come to work.

23  Q    Okay.  If you'd take a look at that notebook with the

24  yellow cover in front of you that has exhibits, and turn to

25  Exhibit 1?  Tell us what that is.

1   A    This looks like a list of exhibit numbers.

2   Q    I'm sorry.  Look behind the tab Number 1 there, if you

3   would?

4   A    Behind which tab?

5   Q    Number 1, look behind it.

6   A    Okay.

7   Q    Do you see that?

8   A    Yes, sir.

9   Q    What is that?

10  A    That was the written paper that was given to me by Steve

11  when we met and discussed the terms of my employment.

12       MR. LICHTENSTEIN:  Okay.  I believe this is stipulated,

13  Your Honor.

14       THE COURT:  Yes, it's an agreed exhibit, Mr. Springer?

15       MR. SPRINGER:  Yes, I have no objection to the admission

16  of the exhibit.

17       THE COURT:  All right, 1 is received.

18       (Plaintiff's Exhibit 1 was received in evidence.)

19       MR. LICHTENSTEIN:  Okay, and if I may show it to the

20  jury?

21       THE COURT:  Yes.

22  Q    (by Mr. Lichtenstein)  So, if you'll look at the very

23  top of the page there, whose handwriting is that?

24  A    Steve Martin's.

25  Q    Okay.  And, that's where he's written estimator?

1   A     Yes, sir.

2   Q     All right.  In fact, whose--is there anything on this

3   page that is not Mr. Martin's handwriting?

4   A     I think the circle around total wages, $11,100, 15

5   percent of total wages.

6   Q     Okay.

7   A     I circled that.

8   Q     And, did you discuss all of the items that are listed on

9   Exhibit 1 with Mr. Martin at that first meeting?

10  A     Yes, I did.

11  Q     Okay.  So, explain that first line.  First of all, how

12  did you come up with the hourly rate of $30.50?

13  A     That was the rate that I was being paid at Diamond Fire.

14  Q     All right.  And, was that the rate that you were

15  eventually paid at when you started at Frontier?

16  A     Yes.

17  Q     Okay.  Now, what does 2080 hours represent?

18  A     That represents 52 weeks of work.

19  Q     Okay.  And, then, it looks like that last figure, the

20  $63,440, what's that?

21  A     I would believe that that would be the rate of $30.50

22  times the 2080 hours.

23  Q     Okay.  Now, did Mr. Martin tell you that that $63,440

24  would be your salary at Frontier?

25  A     No, but I was told that that would be my hourly rate.

1   Q    Okay.  Did you talk about how often you would be paid?

2   A    Yes.

3   Q    How often?

4   A    It would be weekly.

5   Q    And, did you discuss at that meeting whether your pay

6   could be docked for any reason?

7   A    No.

8   Q    The next line talks about vacation.

9   A    Yes.

10  Q    What were you told about Frontier's vacation policy?

11  A    At the time, their vacation policy with employees was

12  after one year, you were entitled to a week's paid vacation.

13  And, what I stated was that I had two weeks paid vacation due

14  me from Diamond Fire.  I had some previous plans made and

15  somehow, we would have to work in at least one week of

16  vacation time for me.

17  Q    Okay.  And, then, the next two lines, profit sharing and

18  bonus, how did those topics come up?

19  A    These were items that were offered to me that Steve

20  mentioned, you know, one of the pluses of working for

21  Frontier, that they had a very good profit sharing plan, and

22  that they had a very generous bonus plan.

23  Q    Okay.  And, then, the next line, it looks like we're

24  just doing a total; is that right?

25  A    Correct.

Lederman - Direct                                    167

1    Q    Okay.  Looking a little further down, there's reference

2    to the company vehicle; do you see that?

3    A    Correct.  Yes.

4    Q    What did Mr. Martin say about a company vehicle?

5    A    It was not a problem.  The estimators always had a

6    company vehicle.

7    Q    All right.  And, then, finally, there is reference to an

8    allowance for personal insurance.

9    A    That's correct.

10   Q    What kind of insurance was that?

11   A    That was health insurance.  The way the plan was set up,

12   I was entitled to that cost, and since my wife already had

13   insurance, I was entitled to the cash reimbursement for part

14   of her policy.

15   Q    Okay.  Was there any talk about you getting commissions

16   at that meeting?

17   A    No, never.

18   Q    Was there ever any talk about your getting commissions

19   at all?

20   A    No.

21   Q    Okay.  So, based on that meeting what did you understand

22   about the job description?

23   A    Well, I had been doing estimating for many years, and

24   pretty much knew what I'd have to do.  I didn't know how long

25   it would take, and, you know, the kind of jobs that we'd been

Lederman - Direct                          168

1  doing, and stuff.  Pretty much had an idea of what the job

2  responsibilities would be.

3  Q    Okay.  Was there any discussion of other job duties you

4  might be assigned?

5  A    Well, I explained to Steve my previous background, and

6  that I did have the ability to assist in other departments

7  other than just the estimating.

8  Q    Okay.  What did he say about that?

9  A    He was kind of excited, to tell you the truth, he was

10 doing a lot of it himself.

11 Q    Okay.  So, after this meeting with Mr. Martin, was this

12 a done deal?

13 A    Yes.

14 Q    Did he tell you that he was authorized to hire you on

15 the spot?

16 A    Not on the spot.  I believe I called him the next day.

17 Q    Okay.  What did he tell you?

18 A    Welcome aboard.

19 Q    Okay.  Had he done anything from the day you met with

20 him until he called to make sure he could offer you the job?

21 A    I don't understand.  What was the question.

22 Q    Well, I'm just wondering if he said he talked to

23 anybody, for example?

24 A    Oh, did he discuss with anybody?

25 Q    Uh-huh.

1    A    I believe he had to get it cleared from Karl.

2    Q    Okay.  Were you going to be the only estimator?

3    A    Yes.

4    Q    So, when did you start, how long after that meeting?

5    A    I believe I gave Diamond two weeks notice.

6    Q    All right.  Do you get business cards when you started

7    with Frontier?

8    A    Yes, I did.

9    Q    What was the job title that was on those business cards?

10   A    Senior estimator.

11   Q    Okay.  Did anyone at Frontier ever call you a salesman?

12   A    Never.

13   Q    Did they ever call you an outside salesman?

14   A    Never.

15   Q    Did they ever tell you that your job involved outside

16   sales?

17   A    Never.

18   Q    So, let's talk now about your actual duties at Frontier

19   as an estimator.  What I'd like you to do is to take us

20   through everything that you did from the beginning of

21   creating a bid until the time the contract is awarded to

22   Frontier.  Can you do that for us?

23   A    Yes.  The first thing you'd have to do would be once you

24   receive the contact from a contractor, make arrangements to

25   get the plans and the bid documents.  We'd have to take those

1   bid plans and documents and review them as for scope,

2   specification, quantities and design.  We would sit down with

3   them, do what they call a take-off.  We would go through all

4   the blue prints, try to determine what would be required to

5   put in a fully functional approved fire protection system

6   that would meet the codes and also the job specifications.

7   Q    Let me just interrupt you.  Why do they call it a take-

8   off?

9   A    Because you actually have to take the plans out, and you

10  sort of spot where you think the sprinkler heads would be

11  required, and then we would, you know, add those up and look

12  at what we would need, type, size-wise, system-wise, you

13  know, water supply to actually provide that amount of heads.

14  And, all of that would have to be taken off and put on a

15  piece of paper, and then I would take that and transpose it

16  onto a--into a bid program that I had on the computer, and

17  determine labor and materials, equipment, tools, anything and

18  everything that might be required, permit costs, engineering

19  costs, all of that had to be broken down and put into that

20  bid.

21  Q    Now, are you actually designing the system at this

22  point?

23  A    Well, a preliminary design, yeah, you've got to do some

24  kind of a design to get an idea of what you have to do.  You

25  have to know, in order to put a price against it, you have to

1  have an idea of what it's going to take to put it in, and if

2  you don't have an idea of how many heads, how much pipe would

3  be involved, it would be difficult to put a price on that.

4  So, we would have to take all of that information and

5  transpose that and convert that into actual dollars, and come

6  up with the bid, you know, the cost of doing the job.

7  Q    Okay.  And, then, what do you do with that bid next?

8  A    Once that's completed, we fill out usually some type of

9  a form, a bid form.  It really depended on the size of the

10 project, the larger projects had a very detailed bid form.

11 It could have been three or four pages.  There could be, on

12 the jobs that required just our own particular bid form that

13 basically gave you a minimal scope of what the work would be,

14 and that cost.

15 Q    Now, would you run these bids by someone else in the

16 company?

17 A    Yes, and the larger bids, you'd sit down with Karl, and

18 later on in my career there, Ken Koslowski would also sit in

19 on those meetings, and we would take my bid sheets, I would

20 make copies of them, and we would sit down, kind of in a room

21 I called the war room, big table, and we would put all the

22 plans out there, and copies of that bid take-off, and review

23 it, and come to an agreement on what--where we would go and

24 what that cost would be, and then go ahead and submit that.

25 Q    Then, how do you submit it?

1    A    Excuse me?

2    Q    How do you transmit it to the contractor?

3    A    Normally, we had faxed.

4    Q    Okay.  You heard Mr. Willingham's testimony; right?

5    A    Yes.

6    Q    And, he was talking about the difference between new

7    construction and existing buildings?

8    A    Correct.

9    Q    Can you tell us more about that from your perspective?

10   A    Well, the new construction, there were plans and--well,

11   for both, there's plans and bid documents.  All right?  With

12   the new construction, you could just sit--the building is not

13   there, so we would have to go in there and actually visualize

14   what this building was going to look like by using all the

15   different plans, the structural plan, the plumbing plan, the

16   HVAC, and putting that all together, and then working up the

17   bid the way I just described it.

18           If there was an existing building, it would be a

19   little more involved because we'd have to go in and look at

20   what the existing conditions are and what the existing system

21   was all about, so we knew what we had to do to modify that

22   system to convert it, let's say if it was a warehouse and

23   they were putting in offices, we'd have to determine where we

24   were going to take that piping and how we were going to get

25   it down to the office spaces.  And, that's the only way you

1    could actually determine how long it would actually take you

2    to do the work, and put the labor together on that, and

3    material.

4           So, the existing systems would require--you would

5    have to go out to the site.  A lot of times, the general

6    contractors would have what they call a pre-bid meeting, and

7    a pre-bid job walk, and they would divide all the various

8    sub-trades, there could be three or four of each sub-trade,

9    you know, four or five sprinkler contractors, and four or

10   five plumbers, et cetera, and we would walk the job and they

11   would show us, based on what the plan was, what they intended

12   to do and how their timing was going to be, and who had to

13   get in where, and so forth.  So, the existing projects were a

14   little more involved as far as getting the information.  The

15   newer jobs were a little easier to work out actually.

16   Q    So, the pre-bid job walks were exactly what Mr.

17   Willingham was talking about?

18   A    Yes, sir.

19   Q    All right.  And, why were they necessary for you?  What

20   was your function when you went to those?

21   A    When you had to determine scope, in order to put a

22   number against it, you had to have an idea of what you were

23   working with, if you were working with high ceilings, if you

24   were working with highly decorative appointment like you have

25   here, you have to be really careful.  You have to put down

1   plastic, there's a lot of different things you have to do

2   that you wouldn't normally have to do if you were in a

3   warehouse dropping a few heads down in just some ceiling

4   areas.  So, you really had to go to the job site to get a

5   good feel of what that project would require, and it was

6   really important that you did that so you could get a good

7   accurate quote, and you weren't just throwing numbers out.

8   Q    Okay.  Did you ever take--

9   A    Excuse me?

10  Q    Did you ever take measurements when you went out to

11  those sites?

12  A    Quite often, yes.

13  Q    Okay.  Now, how many bids would you typically be looking

14  at at one time?

15  A    The bid log usually had ten to twelve, maybe fifteen

16  different bids that were due at different times, and a

17  different variety of bids, and different dates.

18  Q    Okay.  Did they usually have deadlines?

19  A    Oh, yes, most of them did.

20  Q    So, whose job was it to schedule your own work to make

21  sure that you got the bids in on time?

22  A    It was my responsibility.

23  Q    All right.  So, so far, we've talked about a number of

24  tasks, and with the exception of actually picking up plans

25  and doing these job walks for existing buildings, were all

1   the tasks that we've talked about things you did in the

2   office?

3   A     Yes, except for making up the plans and job walking.

4   Q     All right.  So, what happens after you submit a bid?

5   A     The bid would go in.  Usually, I'd wait a day or two.  I

6   kept what they called the bid log on my computer, and I would

7   always pretty much review that on a daily basis, and I would

8   go in there and probably about three or four days a week,

9   depending on the type of project it was, try to make a

10  follow-up phone call and see how we looked, you know, were we

11  in the ballpark, are we low bidders, or so on and so forth.

12  And, then, based on that conversation, either I would

13  continue to follow up at a later date, or I'd know we got the

14  job or we didn't have the job, and we would just move on.

15  Q     All right.  Were there ever times that you actually had

16  to go to a contractor's office or a job site to follow up on

17  your bid?

18  A     Yes, quite often.

19  Q     How often?

20  A     Oh, probably, I don't know, 10 percent of the time

21  maybe, 8, 10 percent of the time.

22  Q     Okay.  What's the purpose of those meetings?

23  A     Those would be kind of like Mr. Willingham described,

24  these are post-bid, pre-award meetings and they would

25  basically bring in sometimes the low, one, two, maybe three

1   bidders.   It would normally happen on a decent sized project.

2   It wouldn't be the smaller ones, you wouldn't have to do it

3   as much, but on any of the larger jobs, they would bring you

4   in and request that you sit with them, and they would go

5   through a whole scope of what you had included to make sure

6   that everything that they needed on the job, you included in

7   your quote, so that they had an apples for apples quote

8   versus the other contractors.

9         And, those were pretty extensive meetings, pretty

10  long meetings, and in some cases, we actually won a job when

11  the other contractor was missing stuff when they got there.

12  We weren't initially low.   Once they added into their quote,

13  stuff that they were missing, we were actually lower in some

14  cases.

15        So, it was, you know, an opportunity for me to

16  actually talk about Frontier, try to give them a warm feeling

17  as to the quality of the company they were dealing with, and

18  how thorough we were and how accurate we are, and everything,

19  and the excellent engineering, whatever it was that would be

20  beneficial that they might even think about giving us the

21  project when we weren't even low bidder.

22  Q   Now, were there ever jobs where Frontier was the low

23  bidder but it didn't get the job after these meetings, post-

24  bid meetings?

25  A   I'm not aware of any job that we lost that we weren't

Lederman - Direct                          177

1   low bidder.  There were some close ones that we didn't get.

2   No, I don't believe, if we were low, we were within, you

3   know, the range of where the numbers had to be, pretty much

4   we got the job.

5   Q    Now, these meetings, were they usually at the

6   contractor's offices?

7   A    Yes.

8   Q    Would those be in the metro area?

9   A    It could be the metro area.  It could have been in Vail,

10  Colorado at the construction office where the project was

11  taking place.  There were meetings in a--there were a few

12  hospital projects that we did up there in Longmont where we

13  actually sat down with them in the job trailer up there

14  during the construction phase of the--the actual building was

15  in progress, but the fire protection hadn't been awarded at

16  that point.  So, it could have been in Saunders office down

17  the street.  There was no set location, it was where I was

18  coming in for the general contractor, you kind of went

19  wherever they needed you to go.

20  Q    Okay.  Were there bids were you never had to leave the

21  office between the time you got the plans and the time you

22  heard Frontier got the job?

23  A    Yes.

24  Q    Was that the usual case?

25  A    There were many times, yes.  It depends on the size of

1   the job and the type of project it was.

2   Q     All right.  So, you submitted the bid, maybe you had

3   gone to a post-bid meeting, maybe not, what happens then?

4   A     Well, hopefully the post-bid meeting went well, and we

5   get the award.  Once the job is awarded to us, then they

6   would submit to us a contract, a subcontract.  I would

7   usually get a copy of that contract, you review for scope and

8   make sure that they didn't stick anything in the contract

9   that was not originally proposed.

10          Once I got that, I would hand it over to Steve or

11  Karl for their review and approval.  At that point, it was my

12  responsibility to create the values and break down, and I

13  would take that quote and we'd bring it back and we'd start

14  breaking out the values because in order to get paid on these

15  projects, you have to submit a requisition for payment, and

16  you have to break down labor and material, engineering, all

17  of those different functions, and put a dollar value on each

18  one of those.  And, you have to submit that to the general

19  contractor right up front so they know what the values are

20  for each particular phase.  So, when they got the first

21  requisition, they would turn around and we would have 30

22  percent of the engineering be complete, maybe 10 percent of

23  the fabrication could be complete, different various

24  percentages of each item.

25          And, then, also, we would use that for our budget

1   purposes.  We would take that value breakdown and create our

2   own internal budget on that, so that everybody in the company

3   was aware of what the numbers were going in, and then as

4   payroll sheets were turned in from the field with the

5   specific job name and job number, it was attached to that,

6   material lists were attached to that, engineering was

7   attached to that, and we would continue to monitor each

8   project as it went through the company, through the system.

9   There could be 25, 30 jobs at any one given time that were

10  going through various stages, either start-up, middle, end.

11          And, also, another thing I had to compare was what

12  they call the manpower log.  And, we kept a manpower log so

13  that each time we got a project, we would put that on the

14  list, and it was my responsibility to give an approximate

15  idea of when that project would start, the duration of the

16  project, and approximately how many men that I had figured we

17  would need for that project for that period of time, so we

18  could accumulate and just have a good feel of each week how

19  many men that, you know, we had on the job, how many fitters

20  we needed on the job for that particular week.  That was kind

21  of a fluid type of a form, because things would constantly

22  change.

23  Q    So, this internal budgeting process, is that something

24  you do in the office?

25  A    Yes.

1  Q    And, creating manpower logs, is that something you do in

2  the office?

3  A    Yes, in the office.

4  Q    And, this coordinating of people at Frontier to make

5  sure they're all on the same page, is that something you do

6  in the office?

7  A    Yes.

8  Q    Now, did you also have some responsibilities on jobs

9  after Frontier has already won the contract?

10  A    There were times that either the engineers were very

11  busy, Steve liked to try to get an engineer to finish a

12  project, completed, so that there weren't any errors, get a

13  good design on a job before he moved them into another

14  project.  A lot of times, right after the job was awarded, we

15  would have to start attending these weekly what they call

16  coordination meetings, and we had to go out to the job site

17  and quite often, if the engineer was not ready to take over

18  the project, I would sit in on their behalf and go to these--

19  someone had to represent the company, so I would go and sit

20  in on these meetings, and either bring back the information

21  to Steve, let him know where we were on each project, so that

22  we could monitor what we were doing and when the contractor

23  expected us to be on site.

24  Q    So, where did these meetings take place?

25  A    On the job sites.

1   Q    All right.  And, geographically, where in Colorado did

2   you have to go for these meetings?

3   A    Oh, again, it could have been in metro Denver, it could

4   have been up in Longmont, the hospital up there, it could

5   have been up in Vail, we had a few projects going there.

6   There were projects in Colorado Springs.  It was spread out

7   all over.

8   Q    Okay.  And, when you made reference earlier to some pre-

9   bid meetings in some of these same places--

10  A    Yes, sir.

11  Q    --how would you compare the number of trips that you

12  would make to these outlying places for these coordination

13  meetings after the contract, with the ones you made pre-bid?

14  A    Well, the coordination meetings were normally once a

15  week, and it really depended on how long it was taking to get

16  an engineer on board to do the project.  So, the pre-bid

17  meeting could have been just the one day, a couple hours of

18  time, versus going up there for four weeks straight to go

19  see, you know, to go to the coordination meeting.

20  Q    Okay.  Can you give an example of a job where you had to

21  go up somewhere on a regular basis?

22  A    Yes.  We had two projects going on in Vail at one time,

23  and I was up there almost every week for oh, probably a month

24  and a half, two months.

25  Q    Okay.

1  A    Taking care of both projects.  I don't remember if they

2  were actually going simultaneously, it could have been one

3  into the other, but that was one example.  Another example

4  would have been the hospital we did up near Longmont, I can't

5  recall the name of the hospital now, but it's right up off

6  the highway there north of Longmont, and quite a few of those

7  meetings that I had gone to as well.

8  Q    I'd like to ask you in your experience, because you've

9  been an estimator for quite a while, was it typical for

10 estimators to go on these post-contract meetings and

11 coordination meetings?

12 A    I don't believe so, no.

13 Q    Okay.  So, why are you the one doing it?

14 A    Well, I had the experience to do it, and if I could help

15 out the company and fill in and as long as I could do the job

16 and handle it, why not, if it was going to help the final

17 cause.

18 Q    Are you done?  I'm sorry.

19 A    Yes.

20 Q    If you look at the span of your career at Frontier, were

21 there sometimes where you had the duties, coordination

22 meetings, these post-contract meetings more often than other

23 times?

24 A    Yes.

25 Q    Can you explain why?

Lederman - Direct                183

1   A    Well, I'll give you probably one example.  I think it
2   was like 2004, we had put out a tremendous amount of bids.
3   We probably were in about the 40 percent success rate.  We
4   had booked and logged a tremendous amount of work, some very
5   complicated projects, I think the Children's Hospital was
6   probably in that grouping.  And, Karl wanted to cut back on
7   the bidding, he felt we had enough back log, so Steve and I
8   talked and we felt that a cut back on the bidding, but the
9   engineers were slammed.  They were just buried with work.
10  So, at that particular--I believe that year, more than any
11  year, it was when I took upon a lot of this project
12  management sort of stuff, these coordination meetings, until
13  the engineer could get going on board and relieve me of that.
14  Q    Okay.  You heard Mr. Willingham talk about change
15  orders?
16  A    Yes, sir.
17  Q    From your perspective, what did you have to do with the
18  change orders?
19  A    As Mr. Willingham mentioned, change orders are very
20  tough deal.  You need to prove to the contractor, so that he
21  can prove to the owner, that you're entitled to a change
22  order.  What happened most of the time is the project
23  manager, who would be our design or engineer at that time,
24  would come in to me, tell me, well, we have to relocate due
25  to whatever circumstances were happening, either they added

1   onto the building, they moved rooms around, whatever the

2   change was that was required, and in order to get a good

3   accurate change order, they're really required to give me

4   good detailed information.

5           The more information they had, the more of a

6   breakdown they had, the better chance we had to be successful

7   in getting that change order approved.  You couldn't just do

8   a one liner and say, well, you owe me $1500.  You had to give

9   them a breakdown, almost like a bid, you had to tell them,

10  designing, engineering, fabrication, everything that's

11  involved, to go ahead and make that change and redo the

12  system so that it would now fit in the revisions that were

13  made out on the site.

14          So, I would take that information that was given to

15  me by the engineers, and most of the time, I shouldn't say

16  most, quite often, there was enough detail on that that they

17  could tell me do this, this and this, that we had to do A, B

18  and C, and I could sit down and talk to that engineer and

19  project manager, and we could determine what we really needed

20  to do, create that change order, and then submit it to the

21  contractor for approval.

22  Q   You said sit down and talk to the engineer.  Did you

23  mean literally sit down?

24  A   Yes, sometimes I'd go right up to their desk in the

25  engineering department and we'd go over that paper he gave

1   me.

2   Q      Is this your own, Frontier's engineering department?

3   A      Excuse me?

4   Q      Are you talking about Frontier's engineering department?

5   A      Yes, Frontier's engineering department.

6   Q      Okay.

7   A      There were other times where I'd have to go out to the

8   site and actually look and see what it was that was required

9   to make that change.

10  Q      Okay.

11  A      Sometimes, it just wasn't cut and dried, that you could

12  actually look at it on paper and say okay, here's what we've

13  got.  You'd have to go out there and look at the job

14  conditions and see if we're trying to work over open holes in

15  the ground, no roof on the building, whatever it might be

16  that would impact the cost on how that change order was made.

17  Q      Okay.  And, in what percentage of the cases did you

18  actually have to go to the job site?

19  A      On change orders?  I don't know the percentage on it,

20  I'd say maybe 5 percent.

21  Q      And, how would you submit the change order to the

22  general contractor?

23  A      We either e-mailed it or faxed it to them.

24  Q      By the way, did you ever turn your cell phone off when

25  you were traveling?

1   A    Not while I was traveling.  I'd turn it off if I was in

2   a meeting.  They don't really want a lot of cell phones

3   ringing.  You're sitting in a coordination meeting, or

4   sitting in a meeting in the job trailer and there's twelve

5   people in there and everybody's got their cell phone on, you

6   start listening to cell phone rings, you don't get anything

7   accomplished.  So, I would turn mine off so there was no

8   disturbance.

9   Q    Now, when you were at Frontier, did you ever have any

10  kind of a sales mileage or sales itinerary?

11  A    No.

12  Q    Did you ever write up sales reports?

13  A    No.

14  Q    Did you ever have a sales catalog or a display catalog?

15  A    No.

16  Q    Ever went to sales conferences?

17  A    No.

18  Q    Ever go to sales trainings?

19  A    No.

20  Q    All right.  Before we leave the subject of your job

21  duties, I do want to ask you about the very beginning of this

22  bid process where you talked about how you--getting plans

23  from the contractor.  How did you find out in the first place

24  that a contractor was interested in getting a bid from

25  Frontier?

1  A    The majority of the solicitation came from them.  They

2  would send us a fax stating that they had a job.  If we were

3  interested in bidding the job, quoting the job, we should

4  sign and return it back to them so they'd know we were

5  interested.  We also had some trade programs that we were,

6  like the Dodge Reports type of a thing that we would get

7  reports on different projects.  And, if we didn't get that

8  invitation, we would contact them and try to see if we could

9  give them a quote on it.  And, that's how probably the

10  majority of the bids were requested, requests for proposals.

11          There were times when we'd get 10 to 12 faxes in a

12  day from different contractors with different types of,

13  whether it be a tenant finish or a new project, or so forth,

14  and that would give us the type of project it was.  They

15  would tell us when the bid was due, and then I'd have to look

16  at it and see if, number one, if they'd want a bid tomorrow,

17  I have six other bids due, I can't do it, or if it's

18  something that's really not down our alley that we're not

19  looking to do that type of work right now.  But, very rarely

20  did we refuse any of these contractors a bid, and I just felt

21  if they were confident enough for us, to select us to get a

22  bid invitation, then we should try to do as many as we could,

23  as best as we could to make--we didn't want to start refusing

24  bids if we didn't have to.

25  Q    Okay.  Was there anything that--or, was there any other

1  way, other than you picking up plans, that Frontier would get

2  plans and specifications from contractors?

3  A    Yes, on occasion there were sometimes we had a--a fitter

4  would bring back plans from a job, sometimes a courier would

5  bring the plans, but for the most part, I preferred to pick

6  up the plans myself if I could.

7  Q    I'd like to talk at this point about how you divided up

8  your time.  And, I was hoping to have an easel for you.  I

9  wonder--oh, okay.

10      MR. LICHTENSTEIN:  If I may set this up, Your Honor?

11      THE COURT:  Mr. Smith will do it.

12      (Pause.)

13      MR. SPRINGER:  Your Honor, may I move closer to--

14      THE COURT:  Yes, sure.

15  Q    (by Mr. Lichtenstein)  And, Mr. Lederman, you need to

16  stand off to the side so the jury can see what you're doing.

17          Let me ask you a question.  What percentage of your

18  time would you say that you spent in the office at Frontier

19  doing all the tasks that you described from the witness stand

20  today?

21  A    Probably I would say around 60 percent.

22  Q    How are you at drawing?

23  A    I used to do it pretty well.

24  Q    Okay.  Why don't cut about a 60 percent slice of that

25  pie, to the best of your ability?  Okay.  And, obviously,

1   other than that 60 percent, you were working away from the

2   office; is that right?

3   A    Correct.

4   Q    Okay.  So, what percentage of your time would you say

5   you spent in travel?

6   A    I would say probably 80 percent of the time.

7   Q    Okay.  Anywhere, just be in your car--

8   A    Traveling to the job sites--

9   Q    Okay, why don't you write it on your chart?

10  A    Okay.

11  Q    And, then, we talked about these site visits where you

12  would go after a contract has been awarded and you're

13  coordinating with all the other trades.  What percentage of

14  your time would you say you spent at those meetings, during

15  the course of your--

16  A    Are you talking about post-bids or job coordination type

17  meetings?

18  Q    Right, after you've already received the contract, yes.

19  A    I would say probably about 10 percent.

20  Q    Okay.  Can you slice off another 10 percent, if you can?

21       Okay, so we've got how much so far?

22  A    88 percent.

23  Q    Okay.  Then, we talked about the time you actually spent

24  picking up plans from contractors.

25  A    I'd say 5 percent.

1  Q    So, when you're picking up plans, do you just stop and

2  run in and run out and get the plans?

3  A    Not normally.  On the plan pickup portion of it, I would

4  try to go in there and kind of at least get a face to face

5  with the contractor, the project manager, whoever it was, the

6  estimator who was working for the project, for the

7  contractor.  If there were any other projects they were

8  involved in maybe we weren't aware of that I might be able to

9  take additional plans with me to actually look at that.  And,

10  then, also on some of these projects, the larger projects

11  where you're picking up like half a tree on these projects,

12  they actually have to have them brought back.  So, we'd have

13  to return those plans, and in most cases, I could probably

14  pretty much drop them off, run in and run out.  But, I always

15  tried to utilize that time either coming in the morning,

16  going home in the evening, where I could actually sit and

17  talk to somebody and try to see if I could find out what else

18  was going on, and bring in more work.

19  Q    Okay.  And, then, we talked about these pre-bid meetings

20  where contractors want to talk to the low bidders.

21  A    Are you talking about the job walks?

22  Q    Well--

23  A    The pre-bid job walk.

24  Q    Okay.  Why don't you give us--tell us what percentage

25  you spent on any kind of pre-bid meetings?

1   A    Well, what have we got left?  Say 2 percent.

2   Q    I don't want to argue with you.  I want your best

3   estimate based on what you recall.

4   A    Okay.  That would be I'd say 3 percent for pre-bid walks

5   review.

6   Q    Okay.  Were you a member of any trade associations?

7   A    Yes.

8   Q    Okay.  So, how many times would you have these meetings

9   of the associations during your work hours?

10  A    The one association would be Colorado Fire Protection

11  Association, it's a state-wide association of fire protection

12  contractors, as far as having (inaudible), your fire

13  marshals, fire chiefs, so forth, different private designers,

14  and we would meet a couple hours in the morning once a month,

15  with the exception of (inaudible).

16  Q    What percentage of your total time was spent at these

17  meetings?

18  A    Oh, I would put 1 percent.

19  Q    All right.  So, what percent do we have left there?

20  A    Well, that's an awful big percent, but about 30 percent.

21  Q    What was taken up with that last 3 percent?

22  A    It could have been less than 3 percent, maybe 1 or 2

23  percent.  I'm just trying to give you a rough idea.

24  Q    Okay.

25  A    That pretty much covers the bid walk, plan pickup, post-

1   bid, anything else I did outside the office.

2   Q    So, we might have to add a little bit to the categories

3   to get that 3 percent.

4   A    Yeah, this might be--

5   Q    It's not additional, or is it additional--

6   A    Yeah, this could be 20 percent and this could be 1

7   percent.

8   Q    Okay.

9   A    I really can't think of anything right off-hand, but

10  there were other things we needed to do.

11  Q    Okay.  You can take your seat.

12            I want to talk about how you were supervised at

13  Frontier.  Who were your supervisors?

14  A    My immediate supervisor was Steve Martin, and at the

15  beginning it was Karl Smith and Steve, but since Karl wasn't

16  around a hell of a lot, Steve was pretty much my immediate

17  supervisor.  Later on through the years when Ken Koslowski

18  started getting involved in the operations end of the

19  business, I would also talk to Kenny, but pretty much Steve

20  and I.

21  Q    Okay.  What was Ken Koslowski's title?

22  A    He came into the office, he was the field

23  superintendent, and then when he came into the office, I

24  don't know if he actually had a title, I always considered

25  him operations manager.  He managed the field fitters, the

1   shop and the purchasing of materials.

2   Q    All right.  What was the nature of the matters that Mr.

3   Smith supervised you on?

4   A    Could you repeat that?

5   Q    What kinds of things did Mr. Smith supervise when he

6   supervised you?

7   A    The only real supervision that I could say as far as

8   supervision would be when we did the reviews to the bids on

9   larger projects.  Most of the conversation went to Steve,

10  then to me, or to Kenny and then to me.

11  Q    Okay.  At this point, I'd like you to turn in your

12  yellow notebook to Exhibit 4, behind the 4 tab there.  Do you

13  see it?

14  A    Yes, I do.

15  Q    And, just tell us generally what that is.

16  A    It's a memorandum to me from Karl Smith dated 2-20-04.

17  Q    Okay.

18       MR. LICHTENSTEIN:  Move the admission of--

19       THE WITNESS:  With regard to estimating.

20       MR. LICHTENSTEIN:  --Exhibit 4.  Okay.  Move the

21  admission of Exhibit 4.

22       MR. SPRINGER:  No objection, Your Honor.

23       THE COURT:  4 received.

24       (Plaintiff's Exhibit 4 was received in evidence.)

25  Q    (by Mr. Lichtenstein)  Did you receive it on or about

Lederman - Direct                                          194

1   February 24th of 2004?

2   A    Probably.

3   Q    Okay.  It's pretty short.  Why don't you--also pretty

4   small, so why don't you read it to us.

5   A    It says, "In the future, you must clear with me before

6   submitting any estimate for jobs in excess of $5,000.  Also,

7   you must clear with me before submitting any budget figures

8   for jobs."

9   Q    Okay.  What did you do when you got this memo?

10  A    Well, I first went to Steve and then we went to Karl to

11  have a discussion about it.

12  Q    Okay.  Why did you want to have a discussion?

13  A    Well, since none of the jobs that we were bidding were

14  under anywhere, you know, 5,000 or under, it really said that

15  anything that goes out the door, he wants to review and

16  approve before I submit, and I couldn't work that way.  He

17  was not around often enough to give me that approval, and

18  with the number of bids that were required to go out the

19  door, we just couldn't go over every little bid and discuss

20  it, and I told him he was severely hampering my ability to do

21  my job.

22  Q    Okay.  Did he ease up on this memo at all?

23  A    I believe that after we had that discussion, he and

24  Steve talked a little bit, and Steve came back to me and

25  said, "Just do what you've got to do."

1   Q    Okay.  Did he still expect you to submit some bids to

2   him for approval?

3   A    Well, some bids, and we did that anyway.  Anything that

4   was large enough that if we had a $500,000 bid or a million

5   and a half dollar bid, it was understood that I would want to

6   have more than one set of eyes on that.  I'd want to have

7   Karl's experience, I would want to have Steve's or Kenny's

8   and mine all put together so that we could get a very

9   accurate quote and be very competitive, yet still be where we

10  had to be.  And, we did quite a lot of that.  But, what this

11  did was basically said I don't want you sending out a single

12  bid.  And, then, the second part of that was budget figures.

13  There was just no physical way to adhere to that letter.  The

14  budget figures were budgets that I would put together before

15  there was even a set of contract documents.  So, I really

16  couldn't do anything with that.  Very frustrating.

17  Q    So, if you'd turn now to Exhibit 5 in the notebook, the

18  very next tab, and tell us what that is?

19  A    This is a memorandum a year later, February 10th, '05,

20  again from Karl to me with regard to estimating.

21  Q    Just a second.

22       THE COURT:  Wait until it's admitted before you talk

23  about it.

24       MR. LICHTENSTEIN:  Move to admit Exhibit 5.

25       MR. SPRINGER:  No objection, Your Honor.

1      THE COURT:  5 is received.

2      (Plaintiff's Exhibit 5 was received in evidence.)

3  Q    (by Mr. Lichtenstein)  Okay.  This one is pretty short,

4  too.

5  A    Yes, sir.

6  Q    And, again, it's pretty small, and I can't seem to get a

7  good angle anyway, so why don't you read it for us.

8  A    "Effective immediately, all bids must be cleared by me

9  before you submit pricing for any jobs.  Failure to comply

10 will be cause for immediate dismissal."

11 Q    And, did you do anything after you received this memo?

12 A    Yes, we had almost an identical conversation that we had

13 the year prior to that.

14 Q    And, what was the upshot of that conversation?

15 A    It would severely impact my ability to do my job, that

16 he was not there enough to be there to actually review all

17 these quotes, and there was just no way to adhere to that

18 letter.  It was very frustrating, to tell you the truth.

19 Q    So, did he change his position?

20 A    Again, yes, we agreed afterwards that we would go back

21 to what we were doing originally, larger jobs, he wanted to

22 see and review with me, and we all agreed to it and moved on.

23 Q    Okay.  At this point, Mr. Lederman, I'd like to move on

24 to the question of the hours that you are claiming in this

25 case.  Let's start with some background.  What was the work

1   week for Frontier--

2       THE COURT:  Since you're going to move to that subject,

3   maybe this is a good time for the break.

4       MR. LICHTENSTEIN:  Sure.

5       THE COURT:  So, we'll take our mid-afternoon recess at

6   this time, members of the jury, with of course the cautions

7   given you earlier.  You know, the rules say I have to caution

8   you every time you leave the courtroom.  I know that you're

9   going to remember from one time to the next what these

10  cautions are, but bear with me.  There are certain things I

11  have to do just to comply with the rules.  So, you know,

12  don't talk about the case.  Limit yourself so you don't come

13  into contact with anything outside the evidence relating to

14  the merits of the case.  You're excused, 15 minutes.

15      (2:50 p.m. - Jury excused.)

16      THE COURT:  Okay, we'll be in recess.

17      (2:50 p.m. - Recess accordingly.)

18      (At 3:06 p.m. on October 25, 2010, with counsel for the

19  parties present, the following proceedings were had☺

20      THE COURT:  Be seated, please.  Okay.

21      MR. LICHTENSTEIN:  Your Honor, if I may?

22      THE COURT:  Yes.

23      MR. LICHTENSTEIN:  I think there might be one pre-

24  deposition matter before Mr. Smith's deposition is read, and

25  I just want to make sure we have a chance to talk to you

1    about it before we start off the next witness.

2         THE COURT:  I don't understand your question.

3         MR. LICHTENSTEIN:  Well, there's one facet of the

4    testimony that I will, once it's read, that you will strike

5    it, and I would encourage that we handle it before we

6    actually--

7         THE COURT:  Are you talking about Smith's deposition?

8         MR. LICHTENSTEIN:  Yes.

9         THE COURT:  Well, are we going to get there?

10        MR. LICHTENSTEIN:  We may.  I don't know.

11        THE COURT:  I thought you were going to call MacKinnon.

12        MR. SPRINGER:  I don't think there's any possible way

13   that we'll get to Mr. Smith's deposition--

14        THE COURT:  Yeah, you're going to cross-examine--

15        MR. SPRINGER:  Yeah.

16        THE COURT:  --Mr. Lederman for some time perhaps.

17        MR. SPRINGER:  And, then, you've got another witness, as

18   I remember.

19        THE COURT:  Well, MacKinnon is the other one listed.

20        MR. LICHTENSTEIN:  Okay.

21        THE COURT:  So, we can talk about it at 4:30.

22        MR. LICHTENSTEIN:  Okay.

23        (3:07 p.m. - Jury present.)

24        THE COURT:  All right, you may continue, Mr.

25   Lichtenstein.

1        MR. LICHTENSTEIN:   Thank you, Your Honor.

2    DIRECT EXAMINATION BY MR. LICHTENSTEIN RESUMES:

3    Q    Mr. Lederman, I know I promised to move on to the next

4    topic, but I did forget one question on the last topic.  Did

5    you ever sign actual sub-contracts on behalf of Frontier?

6    A    No.

7    Q    Okay.  All right, again, at this point, I do want to

8    talk about the hours that you worked when you were at

9    Frontier.  What was Frontier's work week?

10   A    I believe it was Monday to Sunday.

11   Q    All right.  And, were there scheduled hours where you

12   were expected to be working on the job?

13   A    I believe it was 7:30 to 4:30.

14   Q    Okay.  Was there a scheduled lunch hour?

15   A    Yes.

16   Q    What was that?

17   A    When you say scheduled, I had a lunch hour.  It never

18   hit the same time, but I did have an hour for lunch if I

19   needed.

20   Q    Okay.  Did you always take it?

21   A    No.

22   Q    How often did you take it?

23   A    Well, probably three out of five times a week.

24   Q    All right.  And, what did you do the other times?

25   A    Could have been eating in the car and driving.  Could

1   have been brought back into the office, eating while I was

2   putting figures and stuff together.

3   Q    All right.  Now, what time did you typically actually

4   start working?

5   A    If I was in the office, there were many times I'd be

6   there, oh, around 6 o'clock, about the same time Steve got

7   in.

8   Q    You said when I was in the office.  What about other

9   times?

10  A    Well, sometimes I would actually stop on the way in to

11  the office, I wouldn't get there at 6:00.  But, most of the

12  time between 6:00, 6:30 I would be in the office.

13  Q    Okay.  So, times that you stopped on the way in, what

14  are we talking about?

15  A    I might get in at 7:30, 8 o'clock, 9 o'clock, it really

16  depended on where I had to stop first.

17  Q    Okay.

18  A    I tried to schedule those stops before and after,

19  earlier in the day or at the end of the day so that I didn't

20  have to keep popping out and running around, and I could

21  focus on what I had to do.

22  Q    All right.  Now, what time did you typically stop

23  working?

24  A    I'd say probably 5:30, 6:00.

25  Q    Did the company have a way of keeping track of time for

1   its employees?

2   A    The only one I'm aware of is the time sheets we turned

3   in weekly.

4   Q    Okay.  Was there a time clock for anyone?

5   A    No.

6   Q    All right.  When you started at Frontier, were you

7   supposed to fill out time sheets?

8   A    Yes.

9   Q    So, what did you do about your time sheets?  What kind

10  of hours did you typically put on them when you first

11  started?

12  A    Well, when I first started, I put on the actual hours I

13  worked.

14  Q    All right.  And, then, what did you do with those time

15  sheets?

16  A    I would turn them in to the accounting people, I believe

17  it was Lisa at the time.

18  Q    What's Lisa's full name?

19  A    Lisa Bennetts.

20  Q    All right.  Do you remember her full title?

21  A    She was, if I had to give her a title, I'd probably say

22  she was the office administrator.

23  Q    All right.  And, what happened after you turned those

24  sheets in?

25  A    I'm sorry, what was that?

1  Q    What happened after you turned those sheets in with your

2  actual hours on them?

3  A    Well, they would go to Karl for approval, and then once

4  the time sheets were approved, they would go to the

5  accounting department to create payroll checks.

6  Q    All right.  Now, when you turned in these time sheets at

7  the beginning with your actual hours, were your sheets

8  approved?

9  A    No.

10 Q    What happened?

11 A    They gave them back to me.

12 Q    Did anyone ever tell you why they were coming back to

13 you?

14 A    Yes.  I was told that I can only have 40 hours on a time

15 sheet, that everybody in the company was hourly, and that

16 they would only accept 40 hours.

17 Q    Did Mr. Martin ever tell you that?

18 A    Yes.

19 Q    All right.  Did you ever ask Mr. Martin why you wouldn't

20 get overtime for your hours over 40?

21 A    Why I wouldn't?

22 Q    Yes.

23 A    Karl Smith didn't believe in paying overtime.

24 Q    And, that's what Mr. Martin told you?

25 A    Yes.

Lederman - Direct                                203

1   Q    All right.  Did anyone ever tell you that Frontier

2   considered you to be an exempt employee?

3   A    No.

4   Q    Okay.  So, what did you do when your time sheets were

5   being returned to you?

6   A    Well, I wanted a paycheck, I put it in the way I needed

7   to so I could get a check that week.

8   Q    All right.  So, what happened after the time sheets were

9   sent back to you?  Did you start filling them out

10  differently?

11  A    Well, I would put in, say, 40 hours every week.  If I

12  was, you know, and I talked to Steve about the whole

13  situation and we just kept moving on at the time.  I wasn't

14  sure what kind of hours it was going to take to do the job at

15  that point.  You know, it was early on.  And, then, it was--

16  there was no sense in putting in anything other than the 40

17  hours because it was coming back.

18  Q    Okay.  Did you ever talk to Mr. Smith about whether you

19  could do your job in 40 hours?

20  A    Yes.

21  Q    Okay.  Tell us about those discussions.  What was the

22  first time you had a discussion like that?

23  A    Oh, probably very soon after I was told I wouldn't get

24  any overtime.  It was just too much work to do in a 40 hour

25  day.  You just couldn't do it.  None of the other previous

1    estimators before me ever could get it done in 40 hours, and

2    there was just no way I was going to be able to get it done

3    in 40 hours.

4    Q    So, when you had that first discussion with Mr. Smith,

5    was there any kind of resolution?

6    A    No, we just kept moving on.

7    Q    Okay.  Did you continue to work overtime after that?

8    A    Yes, I had to.

9    Q    Were there other times when you and Mr. Smith discussed

10   whether you could finish your work in a 40 hour week?

11   A    Any particular time?

12   Q    Yeah.

13   A    There was one instance where I had to come in on a

14   Saturday, I believe, and I talked to him about it.  We had to

15   get a bid out for the first thing Monday morning, and the

16   only way to physically do it was to come in Saturday, and he

17   told me to go ahead and come in and he'd pay me for the day.

18   Q    So, did you in fact get paid overtime on that occasion?

19   A    Yes, I did, on that occasion.

20   Q    Were there other times you got paid overtime?

21   A    Very limited.

22   Q    Okay.  Do you believe that Mr. Martin knew that you were

23   continuing to work overtime?

24   A    Yes.

25   Q    Okay.  And, why do you believe that?

1   A    Well, a lot of times, we were in and out almost the same

2   time, so, he'd be in at 6:00, 6:15, I might get there at

3   6:30, and there were times when I actually left after him,

4   and he left before me.  So, he was aware.

5   Q    Was there a burglar alarm at the building?

6   A    Yes.

7   Q    Did you have a code for the burglar alarm?

8   A    Yes, I did.

9   Q    What was the purpose of your having a code?

10  A    To allow me to come in, open up in the morning if I had

11  to, or close up at night if I was the last one there out.

12  Q    Okay.  So, about how many times did you discuss with Mr.

13  Smith overall that you were not getting paid overtime, and

14  you thought you should?

15  A    Dozens.

16  Q    Okay.  How about with Mr. Martin, how many times did you

17  have those discussions with him?

18  A    Not as many.  I just felt if it was Steve's decision, he

19  probably wouldn't have a problem, but Karl was just adamant

20  about it, and no sense in setting Steve over.

21  Q    Okay.  Did you ever have a discussion with Mr. Martin

22  about banking time so that you could take time off at some

23  other time?

24  A    We, early on, again, I think we talked about that.  I

25  think that may have had something to do with that week's

1  vacation we were trying to work out that I had the first

2  year.  We were trying to work in that week's vacation.  But,

3  later on, they told me it was just not going to work, that I

4  couldn't bank the time and take the time off.

5  Q    Okay.  So, you're not putting your overtime on your time

6  sheets after a while, did you do anything else to keep track

7  of your time?

8  A    Yes, I did.

9  Q    What did you do?

10 A    I created an Excel spreadsheet, and I started putting in

11 my time, my actual time for the day, for the week, the month.

12 Eventually, it turned out to be quite a few years.

13 Q    And, where did you keep that spreadsheet?

14 A    I kept it at home.

15 Q    On your home computer?

16 A    Yes.

17 Q    All right.  Did you turn in those spreadsheets to the

18 company?

19 A    No.

20 Q    All right.  If you would turn to Exhibit 2 in your

21 notebook there, and tell us what that is?

22 A    Which one?

23 Q    Exhibit 2.

24 A    2?  Yes, that's the first sheet would be my spreadsheet

25 for the year 2004, starting with the week of January 5, 2004,

1   and the second page is the same summary sheet, Excel

2   spreadsheet from 2005.

3   Q    Okay.  Now, when did you start keeping these

4   spreadsheets?

5   A    2002.

6   Q    Okay.  And, did you continue to keep them?  How long did

7   you keep doing it?

8   A    I think I finally stopped around 2006.  2005 was the

9   last full year that I kept them.

10  Q    Okay.  How far into 2006 do you think you kept them?

11  A    Maybe a week or two.

12  Q    Okay.

13       MR. LICHTENSTEIN:  Move for the admission of Exhibit 2.

14       MR. SPRINGER:  What's the exhibit number?

15       MR. LICHTENSTEIN:  2.

16       MR. SPRINGER:  Your Honor, may I voir dire on Exhibit 2?

17       THE COURT:  Yes, you may.

18  VOIR DIRE EXAMINATION BY MR. SPRINGER:

19  Q    Mr. Lederman, did you have an Excel spreadsheet for 2003

20  and for 2002?

21  A    Yes.

22  Q    Where is that portion of the Excel spreadsheet today?

23  A    It wasn't part of this procedure.

24  Q    So, you didn't produce it with these documents, but you

25  do have it?

Lederman - Direct                          208

1   A     I believe my attorney might have it.

2         MR. SPRINGER:  No further questions on Exhibit 2.  No

3   objection to Exhibit 2.

4         THE COURT:  All right.  Then, Exhibit 2 is received.

5         (Plaintiff's Exhibit 2 was received in evidence.)

6   DIRECT EXAMINATION BY MR. LICHTENSTEIN RESUMES:

7   Q     By the way, Mr. Lederman, would you open defendant's

8   exhibit book, to your left there?  Turn to Exhibit C.

9   A     Yes, sir.

10  Q     And, what does Exhibit C include?

11  A     That's the same summary sheet that I had for the time

12  April 8th, '02 to April--oh, I'm sorry--yeah, the week of

13  April 8th, 2002 through the end of the year.  And, the next

14  page is the same for 2003.

15  Q     Okay.  Does that refresh your memory as to whether you

16  produced those spreadsheets to the defense in this case?

17  A     Yes.

18  Q     Okay.  By the way, why did you stop keeping track of

19  your hours in 2006?

20  A     The whole situation was getting old.  I had been docked

21  for some time at the beginning of that year, I was out for my

22  daughter's wedding and needed a day extra, I believe, and

23  they docked me for it, and I kind of had enough.  I asked for

24  a meeting between myself, Steve Martin, Ken Koslowski and

25  Karl Smith.

1   Q    What was the result of that meeting?

2   A    Well, I told them that this was getting crazy, that I

3   have all these hours and you're docking me for hours, that

4   I'm working and giving you basically 50 hours a week, which

5   is equivalent to almost an extra week a month, and that I

6   wanted--in order for me to stay there and continue working, I

7   wanted 12 personal days.  I wanted one out of the five days a

8   week I felt that I was entitled to.  They could keep the

9   other four.

10  Q    Okay.

11  A    After that meeting, they said they'd let me know, and I

12  don't believe I remember who told me, it could have been

13  Steve, it probably wasn't Karl, but they agreed to give me

14  six days a year as personal days, to be used however I

15  wanted, which would accumulate a half a day a month.  So, for

16  every two months, I would get a personal day, and I just said

17  to myself that's as good as it's going to get, and I just

18  stopped, you know, stopped keeping track of all the hours and

19  just moved on from there.

20  Q    Okay.  So, let's have a look at your spreadsheet here,

21  Exhibit 2.  And, you said the first page, which is what we're

22  looking at now, is for which year again?

23  A    2004.

24  Q    Okay.  How often did you make entries in this

25  spreadsheet?

1    A    I keep a little sheet on the side of my monitor, and I

2    would, every couple of days, just jot it down, and then when

3    I had a few minutes, I'd sit down and plug it into the Excel

4    spreadsheet.

5    Q    So, how often would you transfer what you had written

6    down into the spreadsheet?

7    A    Well, probably maybe once a week.

8    Q    Okay.  And, this is how they looked, the spreadsheet

9    essentially looked on your computer; is that right?

10   A    That's correct.

11   Q    Okay.  So, let's take a few sample weeks in 2004 and see

12   how this worked.  And, we're going to start with August 9th.

13   That's down toward the bottom of what we've got on the screen

14   here.

15   A    Correct.

16   Q    Are you looking at August 9th with me?  You've got two

17   numbers for each day, and what do those numbers represent?

18   A    The first column under the day is the regular hours, and

19   the second column under that day would be any overtime hours

20   that I had that day.

21   Q    Okay.  So, August 9th itself, how many hours did you

22   work that day?

23   A    I had eight hours.

24   Q    And, August 10th?

25   A    I'm sorry, the 10th?  10 ½ hours.

Lederman - Direct                         211

1  Q    Okay.  And, so on through the week.  And, then, the last

2  column, what do those two numbers represent?

3  A    The first column, the total, is the total regular hours

4  that would be accumulated through the formula that I had.  As

5  I plugged them in, they totaled up in that box.  And, in the

6  second would be the total overtime hours.

7  Q    Okay.

8  A    For that week.

9  Q    All right.  You talked about formula.  What do you mean

10  by that?

11  A    Well, on an Excel spreadsheet, you can have different

12  columns, and different--when you put a number in, it will

13  actually total as you go, so you're not actually physically

14  adding them up, it's doing it for you automatically.

15  Q    Okay.  So, if you change a number in an earlier column,

16  it's going to be reflected in the total automatically?

17  A    Yes, it will automatically change.

18  Q    Okay.  So, how many total hours did you work the week of

19  August 9, 2004?

20  A    August 9th?

21  Q    That week of August 9th.

22  A    49 hours.

23  Q    Okay.  Let's go down to the week of September 6th.  That

24  is, of course, a holiday week.

25  A    Correct.

Lederman - Direct                               212

 1      THE COURT:  If I may interrupt a moment.  You know, you

 2  may have some trouble reading these numbers, I do, but I

 3  didn't give you an eye test here.  But, it isn't necessary

 4  for you to rely on your memory of these numbers.  You will

 5  have this exhibit and all other exhibits with you in the jury

 6  room when it's time to deliberate in the case.  So, it's

 7  projected in this fashion, or as we say, published, for ease

 8  of the witness and you in the course of taking the testimony.

 9  But, if you have trouble reading it, don't worry about it.

10      MR. LICHTENSTEIN:  Thank you, Your Honor.

11      THE COURT:  Go ahead.

12  Q    (by Mr. Lichtenstein)  And, let's explain to the jury

13  what these colors mean in your chart, because it is hard to

14  read.  You've got some blue squares; right?

15  A    Yes.

16  Q    And, then, you've got a word at the bottom in your blue

17  square.  What word is that?

18  A    They would represent a paid holiday.

19  Q    Okay.  And, then, the green squares represent what?

20  A    That would be paid vacation days.

21  Q    Okay.  So, obviously, September 6th--

22  A    Can I correct that?

23  Q    What?

24  A    Can I correct that?  The green is actually days that I

25  took for vacation.  There are some on here that I actually

Lederman - Direct                                                213

1   didn't have for paid days.

2   Q    Okay.  So, obviously, September 6th was Labor Day; is

3   that right?

4   A    Correct.

5   Q    What number do you have filled in for September 6th?

6   A    Eight hours.

7   Q    Did you actually work eight hours that day?

8   A    No.

9   Q    All right.  So, if you take the total across, you've got

10  39 regular hours for that week?

11  A    That's correct.

12  Q    How many hours did you actually work that week?

13  A    31 plus the seven, 38 hours.

14  Q    All right.  So, why is it that you have 39 and seven in

15  the chart?

16  A    I was just accumulating the hours for the week.  I just

17  put in whatever was in there.  I didn't understand that those

18  hours, I wasn't entitled to at the time when I was filling

19  out the chart.

20  Q    Okay.  So, are you actually claiming any overtime for

21  the week of September 6th in this case?

22  A    I don't believe so, no.

23  Q    All right.  When you prepared these spreadsheets, had

24  you ever spoken to an attorney about the overtime laws?

25  A    No.

1   Q    Ever done any research about them?

2   A    No.

3   Q    Okay.  Let's go on to the week of October 4th, and if

4   you go across to the last day of that week, Friday, what

5   number do you have in there for your regular hours?

6   A    Six hours.

7   Q    Okay.  Do you know why you worked six hours instead of

8   eight on that day?

9   A    At this point, I couldn't tell you.  It could have been

10  a doctor's appointment, it could have been something that I

11  had to leave earlier in the day for.  If it was a Friday, I

12  might have been on the way to the airport.  I used on, on

13  Friday, take long weekends to go see my grandchildren in

14  Florida.

15  Q    Okay.  Did the company approve those long weekends?

16  A    Yes, if I was going to leave, I'd tell Steve I might be

17  out of there a couple hours early.

18  Q    Okay.  So, again, if you carry the numbers across for

19  the week of October 4th, what are the totals in the last

20  column?

21  A    Total would be 48.

22  Q    All right.  So, how many hours of overtime are you

23  claiming for that week?

24  A    I would imagine eight.

25  Q    Okay.  Next, I want to show the week of November 22nd,

1  and you've obviously got a holiday in there.

2  A    Correct.

3  Q    What number do you have in that block?

4  A    Eight.

5  Q    Okay.  And, then, you've also got overtime on that day;

6  is that right?

7  A    Correct.

8  Q    Did you work on Thanksgiving that year?

9  A    That day, I did actually work that day.

10  Q    Okay.  So, let's turn now to 2005, and just pick up just

11  a few examples in that year.  Now, you've got some new

12  columns on this chart for 2005.

13  A    Correct.

14  Q    All right.  And, you've got a key down at the bottom of

15  the page.

16  A    Correct.

17  Q    Okay.  So, what does the yellow block mean?

18  A    The yellow was a sick day.  I was actually out sick.

19  Q    All right.  And, it looks like you've only got one sick

20  day on this whole page.

21  A    That's correct.

22  Q    You've got the--what do you have in that yellow block?

23  A    Excuse me?

24  Q    What's written in that yellow block?

25  A    Oh, just an "S".  No hours.

Lederman - Direct                          216

1    Q    Okay.  Did you get sick time at Frontier?

2    A    No.

3    Q    Did you take a lot of sick time?

4    A    No.

5    Q    What happens if you're sick when you're at Frontier?

6    A    If I had some vacation days, I could use a vacation day.

7    If I had a personal day, I could use that.  Other than that,

8    I wouldn't get paid for the day.

9    Q    All right.  And, then, you've also got some pink squares

10   in there.

11   A    Yes.

12   Q    Are those pink squares relevant in any way to the number

13   of hours you worked?

14   A    No.

15   Q    Okay.  So, all the pink squares, what numbers do you

16   have in them?

17   A    It looks like they were all eights.

18   Q    Okay.  Did you actually work eight hours on those days?

19   A    Yes.

20   Q    Okay.  And, finally, I want to look at the week of

21   August 15th.  Where were you the week--what did you do the

22   week before August 15th?

23   A    It looks like I was on vacation.

24   Q    Okay.  And, then, on Monday, August 15th, what do you

25   have in those two columns?

Lederman - Direct                                   217

1   A     Zeros.

2   Q     So, what happened on that day, do you know?

3   A     I believe my flight was cancelled.  I think I was in

4   Houston.  I stayed overnight and I didn't get back until

5   later in the day.

6   Q     Okay.

7   A     Didn't come in that day.

8   Q     So, were you able to work at all that day?

9   A     No.

10  Q     How many total hours did you work that week of August

11  15th?

12  A     Of which week?

13  Q     The week of August 15th.

14  A     42 ½ hours.

15  Q     Okay.  And, that takes into account the fact that you

16  didn't work on Monday?

17  A     I believe so, yes.

18  Q     Did you get paid overtime for that week?

19  A     No.

20  Q     Did you get paid for a full 40 hours that week?

21  A     I don't believe so.

22  Q     What happened?

23  A     I think I got docked for the day.

24  Q     Okay.  And, did you complain about that?

25  A     Yes.

1   Q    Okay.  Would you turn in your--in that same book to

2   Exhibit 8?  Are you with me?  This is behind Tab 8.  Tell us

3   what that is, what Exhibit 8 is?

4   A    These look to be a few pay stubs.

5   Q    Is there anything unusual about these pay stubs?

6   A    Well, the first one is only 24 hours pay.

7   Q    Okay.  How did you choose the pay stubs that you have in

8   Exhibit 8?

9   A    I was just trying to locate pay stubs that I could find

10  at the time that they would either indicate where I was

11  either paid overtime or I was paid short hours.

12  Q    And, if you'd turn to the second to the last page of

13  Exhibit 8?

14  A    Next to the last page?

15  Q    Yes.

16  A    Okay.

17  Q    What pay period is that for?

18  A    From--it's August 15th to the 21st of '05.

19  Q    Is that the same week we were just talking about?

20  A    I believe so, yes.

21  Q    So, does that help you determine whether you were in

22  fact paid less than a full week that week?

23  A    Yes, I was docked eight hours that week.

24  Q    All right, thank you.

25       MR. LICHTENSTEIN:  Move for the admission of Exhibit 8.

1       MR. SPRINGER:  No objection.

2       THE COURT:  Received, 8.

3       (Plaintiff's Exhibit 8 was received in evidence.)

4   Q    (by Mr. Lichtenstein)  Mr. Lederman, did you ever have

5   to take care of personal matters during the scheduled work

6   day?

7   A    Yes.

8   Q    What kinds of things?

9   A    What type of things?

10  Q    Yes.

11  A    Not a lot of things, kind of your ordinary stuff that

12  you might do, stop at a grocery store on the way out, maybe

13  run out and pick up something at Best Buy, or something to

14  that effect.  There were occasions where I would have to take

15  my wife to a doctor's appointment, but I wouldn't put in for

16  that time.

17  Q    Okay.  By wouldn't put in, what do you mean?

18  A    I wouldn't show those hours that I was with my wife on

19  my time sheet.

20  Q    All right.  How would you account for other hours that

21  you spent on these errands on your spreadsheet?

22  A    I didn't really account for it.  You do it most of the

23  time through either my lunch period, my lunch time.  If I

24  didn't take lunch, I might do something for 15, 20 minutes,

25  and not take lunch.  Didn't have a lot of time to do a hell

Lederman - Direct                          220

1   of a lot of personal things during the day.

2   Q    Okay.  If you look, go back to Exhibit 2, if you would,

3   and look at the week of September 19th of 2005?

4   A    What day?

5   Q    September 19th, on the second page.

6   A    Oh, 2005, okay.  Okay.

7   Q    Just read across the numbers you worked each day that

8   week.

9   A    Six, five, seven, six, six.

10  Q    Do you know what was going on that week?

11  A    It might have been the week that I had to have some

12  procedures done.  I had some physical problems that I had to

13  have taken care of.  I don't remember if that was the

14  particular week.

15  Q    Okay.  Did you ever spend time during the work day

16  organizing a golf tournament?

17  A    Yes, I did.

18  Q    Who sponsored that tournament?

19  A    The Colorado Fire Protection Association.

20  Q    And, what is that association?

21  A    Excuse me?

22  Q    What is the Colorado Fire Protection Association?

23  A    Colorado Fire Protection Association is a state-wide

24  association that is comprised of fire protection, fire

25  suppression contractors, fire marshals, fire chiefs,

1   authorities having jurisdiction.

2   Q    Okay.  Did Mr. Martin know that you were spending time

3   organizing a golf tournament?

4   A    Yes.

5   Q    Did you believe you were authorized to do that?

6   A    Yes.

7   Q    All right.  Did the work that you did for the

8   association somehow benefit Frontier?

9   A    Oh, absolutely.

10  Q    Why?

11  A    Well, it's not Gary Lederman doing the--chairing the

12  tournament, it was a benefit tournament that was being

13  handled by Gary Lederman from Frontier Fire.  We were active

14  in the group.  In fact, some of those years, Steve was

15  actually the president of that association.  And, we felt

16  that--at least I felt that it was a very worthy group that we

17  did that benefit tournament for, and most of the time spent

18  on it was on my own time.  I would have meetings very early

19  in the morning, and worked on it in the evening or weekends.

20  Q    So, how did you account for that time on the

21  spreadsheet?

22  A    It's not.

23  Q    Okay.  Did you ever try to hide from the company

24  overtime hours that you were putting in?

25  A    I'm sorry, what was the question?

1  Q    Did you ever try to hide the overtime hours that you

2  were putting in from the company?

3  A    Not at all.

4  Q    All right.  So, next, I'd like you to turn to Exhibit 9

5  in your notebook, if you would?  Tell us what that is.

6  A    These are the summary sheets, taking into consideration

7  the hours that are indicated on the Excel spreadsheets, and

8  converted into a summary of the particular week, the total

9  hours and the overtime hours that are--that we believe we

10  were entitled to.

11  Q    So, there's a series of tables here; right?

12  A    Yes, sir.

13  Q    And, what does each row going across represent?

14  A    The particular week.

15  Q    Okay.  And, then, for each week, what else do you have,

16  what other information?

17  A    As far as the columns go?

18  Q    Yeah.

19  A    Well, first, you've got the week, for example, of August

20  9th, you would have total hours, which would relate to the 49

21  hours on the spreadsheet, and a resulting overtime hour,

22  which would be nine hours, which would be the 49 hours,

23  backing out the 40 hours regular time, resulting in nine

24  hours.

25  Q    And, track that with the first week that we discussed,

Lederman - Direct                                   223

1   as we were going through your spreadsheets; right?

2   A    Correct.

3   Q    Okay.  So, what time period does the first page of the

4   table represent?

5   A    I believe it's August 9th through December 31st of 2004,

6   which would relate to the furthest we could go back with

7   regard to when we started the lawsuit.

8   Q    Okay.  Then, on the second page, what period does that

9   cover?

10  A    That's January 3rd of 2005 through August 13th of 2005.

11  Q    And, then, the third page, you've got two tables there.

12  A    Correct.

13  Q    What do those two--what time periods do those two tables

14  represent?

15  A    August 14th of 2005 through October 2nd, 2005, which was

16  at one pay rate, and then the second one would be the

17  remainder of the year, October 3rd, 2005 through December of

18  2005 after a pay raise.

19  Q    Okay.  And, if you'd turn to Exhibit 7 in your notebook,

20  tell us what that is?

21  A    This is a status payroll change report.

22  Q    Okay.  And, what does it relate to?

23  A    It relates to an increase in pay.

24  Q    And, what's the date on that?

25  A    Let's see, it doesn't show a date.  The only date on

Lederman - Direct                    224

1   here is--it says reason, $2 per hour from 10-2-05.

2   Q    Okay.  So, is that the raise that you were just

3   referring to?

4   A    I believe so.

5   Q    Okay.

6        MR. LICHTENSTEIN:  At this time, I'd move for the

7   admission of Exhibits 7 and 9.

8        MR. SPRINGER:  No objection.

9        THE COURT:  They are received.

10       (Plaintiff's Exhibits 7 and 9 were received in

11  evidence.)

12  Q    (by Mr. Lichtenstein)  So, let's go back to these tables

13  that you were just describing.  And, this is the first page

14  of Exhibit 9.  And, again, we have each week going across;

15  correct?

16  A    Correct.

17  Q    And, does this accurately summarize the actual hours you

18  worked according to your spreadsheets?

19  A    Correct.

20  Q    And, then, at the bottom of the page, the last row says

21  what?

22  A    That's the total overtime hours for that time period,

23  177.5

24  Q    Okay.  And, then, the next page takes us from January

25  3rd to August 13th?

Lederman - Direct                                      225

1   A    Correct.

2   Q    And, then, what is at the very end of this table, at the

3   bottom of the second column, what does that represent?

4   A    It's the total overtime hours, extrapolated from that

5   from January 3rd through August 13th, 186 hours.

6   Q    And, the third page, two additional tables, and again

7   what do the bottom rows in each of these tables represent?

8   A    The hours for that time frame, 42 ½ for the before

9   raise, and 96 hours for after the raise.

10  Q    Okay.  Does Exhibit 9 include any holiday hours that you

11  didn't work?

12  A    I don't believe so, no.

13  Q    Okay.  Does it include any vacation hours that you

14  didn't work?

15  A    No.

16  Q    Now, we don't have any spreadsheets for the year 2006 or

17  2007.

18  A    Correct.

19  Q    Have you tried to estimate how many hours you worked in

20  those two years?

21  A    Yes, I have.

22  Q    Tell us how you went about trying to estimate those

23  hours?

24  A    I tried to find a comparable year that I did have

25  information on, and put kind of a formula together, X over

1    one number, equals Y over another.  One of the years that was

2    typical in the amount of bids that we produced, I believe was

3    2004, so we had--we produced about $29 million in quotes that

4    year.  2006, I had $36 million in quotes.  So, I basically

5    took the overtime hours plus the regular hours, the total

6    hours to complete the $29 million in work, and worked it out

7    with an X over, equals, divided by, so forth, and came up

8    with about 600 hours that it would have taken to do the $36

9    million worth of quotes that we put out, versus the 29

10   million.  So, we have an approximate time frame it takes to

11   do that work, similar work, similar circumstances, would be

12   an approximate, kind of a ballpark figure to work with.

13   Q    Okay.  What did you do about 2007?

14   A    Similar.  Similar procedure.  We took the total sales to

15   that point--not total sales, but total bids.  We had almost

16   the same, $29 million in bids on the first six months of

17   2007.

18   Q    Wait a second.  You had as many--as much bid volume in

19   the first five months of 2007 as you did in 2006?

20   A    Maybe not as much.  No, I had 36 million, and then went

21   back to 29 million.

22   Q    But, that 29 million was for what portion of 2007?

23   A    That was for the first six months.

24   Q    Okay.  Turn to Exhibit 10 in your notebook, if you

25   would?  What is Exhibit 10?

Lederman - Direct                    227

1   A     Exhibit 10 is a summary of the overtime pay claim,

2   breaking it up into time periods and years.

3   Q     Okay.   What does each row correspond to in Exhibit 10?

4   A     Each row would be a time frame, tied into those charts

5   we just looked at, really.

6   Q     Okay.

7   A     For each year.

8   Q     And, you've got five columns here.   What's the first

9   column?

10  A     Excuse me?

11  Q     What is the first column?

12  A     The first column is the time period.

13  Q     And, the second column?

14  A     Is the source for hours worked.

15  Q     And, the--by source, you mean what?

16  A     Either--well, for the first four rows, we had time

17  sheets, so the last two, we had to do some type of an

18  estimate.

19  Q     Okay.   The third column is what?

20  A     Third column is the overtime rate.

21  Q     And, that's a time and a half rate?

22  A     Correct.

23  Q     And, the fourth column?

24  A     Would be the overtime hours worked.

25  Q     Okay.   And, the last column?

1    A    Would be the resulting overtime pay.

2    Q    Okay.

3         MR. LICHTENSTEIN:  Move for the admission of Exhibit 10.

4         MR. SPRINGER:  No objection.

5         THE COURT:  Received, 10.

6         (Plaintiff's Exhibit 10 was received in evidence.)

7    Q    (by Mr. Lichtenstein)  So, just to explain exactly how

8    this works, let's look at that fourth column.  For the first

9    period, does that correspond to one of the tables in Exhibit

10   9 that we just looked at?

11   A    Excuse me?

12   Q    The first item in the overtime hours worked column,

13   which is the second column from the end, does that correspond

14   to one of the tables in Exhibit 9?

15   A    Yes.

16   Q    And, does the, likewise, the second, third and fourth,

17   because those all come up on your time sheets, do those also

18   correspond to--

19   A    Yes.

20   Q    --tables in Exhibit 9?

21   A    Yes, they do.

22   Q    And, then, the fifth row, you've got 475 hours.

23   A    Correct.

24   Q    And, I think you said you thought 2004 was a year that

25   you used as a comparison to 2006?

1   A     Right.

2   Q     About how many overtime hours did you have in the

3   spreadsheet for 2004?

4   A     I'm sorry, what was the question?

5   Q     You used the overtime hours you worked in 2004 as a

6   basis for your estimate for 2006; right?

7   A     I believe it was 2004, yes.  It might have been 2005.

8   Q     Okay.

9   A     I believe it was 2005.

10  Q     Is there something that might refresh your memory on

11  that?

12  A     Yeah, my bid blocks.  Bid block, that's where all these

13  numbers are.

14  Q     Why don't you look at the defendant's book, Exhibit C.

15  A     Exhibit what?

16  Q     Exhibit C.

17  A     C?

18  Q     Can you see there's a page numbered 5 in the lower

19  right-hand corner?

20  A     Correct.

21  Q     Does that refresh your memory on the approximate total

22  number of hours that you worked in 2004?

23  A     Yes.

24  Q     Okay.

25  A     The total hours or total overtime?

Lederman - Direct                                230

1   Q    Total overtime.

2   A    496.6 overall for the year.

3   Q    Okay.  So, you've actually got a lower number for 2006;

4   is that right?

5   A    Correct.

6   Q    Why did you put a lower number in this table?

7   A    Well, we were trying to be conservative, and this was a

8   best guess, using a formula to come up with, some scientific

9   data to come up with the hours that would be reliable.

10  Q    Okay.

11  A    So, we backed it down so that there was enough room in

12  there so there would be no question.

13  Q    Thank you.  How confident are you that you worked at

14  least 475 overtime hours in the year 2006?

15  A    Oh, very confident.

16  Q    Okay.  And, how confident are you that you worked at

17  least 197 ½ hours in the year 2007?

18  A    Very confident.

19  Q    That would be of overtime.

20  A    Yes.

21  Q    I didn't ask that question properly.

22       You're now a sales manager?

23  A    Yes, I am.

24  Q    Do you have a laptop?

25  A    Yes, sir.

Lederman - Direct                               231

1   Q   What do you use it for?

2   A   To prepare quotes, answer e-mail.

3   Q   Okay.  Do you have a sales kit?

4   A   Yes, I do.

5   Q   A sales itinerary?

6   A   Yes, I do.

7   Q   Do you have to fill out reports?

8   A   Quarterly report, yes.

9   Q   Okay.  Do you get commissions?

10  A   Yes, I do.

11  Q   And, does your company manufacture the product you sell?

12  A   Certain parts of it, yes.

13  Q   Okay.

14  A   Most of it is manufactured--we're a manufacturer and

15  distributor, but we do have some parts and pieces we actually

16  manufacture ourselves.

17  Q   Do you have to put bids together at your current job?

18  A   It's not a bid, it's a quote.  It's just we're selling

19  just equipment, it's just--it's a one liner.  There is no

20  breakdown like an estimate.  It's just a quote on a

21  particular part number.

22  Q   Okay.  So, can you put a quote together at the

23  customer's place of business?

24  A   Oh, sure.

25  Q   What are the price ranges of the product you sell now?

Lederman - Direct                                    232

1   A    On a per part basis or are you talking about an average

2   purchase order?

3   Q    Yeah, typical purchase order.

4   A    Typical purchase order could be $1,000.

5   Q    All right.

6   A    $1,200.

7   Q    Do you have to have your sales approved by anyone above

8   you at the company?

9   A    No.

10  Q    How much of your time do you spend on the road?

11  A    About 98 percent.

12  Q    Okay.

13       MR. LICHTENSTEIN:  Your Honor, I just want to check and

14  make sure I've got all the exhibits admitted that I wanted to

15  through this witness.

16       THE COURT:  All right.

17       (Pause.)

18       MR. LICHTENSTEIN:  Okay, I have no further questions.

19       THE COURT:  All right.  Mr. Springer?

20       MR. SPRINGER:  Thank you, Your Honor.

21                         CROSS-EXAMINATION

22  BY MR. SPRINGER:

23  Q    Good afternoon, Mr. Lederman.

24  A    Mr. Lederman (pronouncing), yes.

25  Q    Lederman, I'm sorry, Mr. Lederman.  You testified that

1  you went out of town for your daughter's wedding once and got

2  docked; was that your testimony?

3  A    No.

4  Q    You didn't get paid for it?

5  A    My daughter's wedding was here in Denver.

6  Q    Okay.  You went to--planning for the daughter's wedding,

7  and didn't get paid?

8  A    No, I didn't go anywhere to go planning for the wedding,

9  no.

10 Q    Did the company have some issues with you telling them

11 that you were one place when they found out you were another

12 place and not really working; do you remember that?

13 A    Not that I'm aware of, no.

14 Q    Was there a GPS device that was attached to different

15 vehicles, company vehicles?

16 A    Yes, there was.

17 Q    And, was your vehicle one of them?

18 A    Yes, it was.

19 Q    And, were you confronted by the company on more than one

20 occasion and asked why the GPS device indicated you were one

21 place, when you were telling you were in another place?

22 A    There were times, yes.

23 Q    And, do you remember, for example, telling them you were

24 at a business meeting, but the GPS device told the company,

25 or at least the company told you that the device said you

1  were at the airport; do you remember that?

2  A    No.

3  Q    Mr. Lederman, the fact is that you understand that in

4  this lawsuit, you now understand, that if you're considered

5  an outside sales person, you're exempt from overtime; do you

6  understand that now?

7  A    Yes, I do.

8  Q    And, when you recently had your lawyers file this

9  lawsuit, you claimed in the lawsuit, you admitted then that

10  you were a salesman, didn't you?

11  A    I never admitted that I was an outside salesman, no.

12  Q    You admitted you were a salesman, didn't you?

13  A    I--are you taking it out of context?  Show me where I

14  said that.  I don't believe I would ever say that I was a

15  salesman.

16  Q    Do you have defendant's exhibits in front of you, sir?

17  A    Yes.

18  Q    Would you please kindly take a look at Exhibit R?  Have

19  you seen this document before?

20  A    I might have seen it at the deposition.

21  Q    Was this a document that your lawyers filed on your

22  behalf in this case, called a complaint and jury demand?

23  A    Yes.

24  Q    And, they were authorized to file it, weren't they?

25  A    Yes.

1   Q    And, if you look at the last page, it appears to have

2   been dated August 13, 2007.  Does that refresh your memory as

3   to roughly when you would have filed the lawsuit?

4   A    I'm sorry, what page?

5   Q    The last page.

6   A    Yes.

7        MR. SPRINGER:  Move the admission of Exhibit R.

8        MR. LICHTENSTEIN:  I'm going to object.  It's a

9   pleading--

10       THE COURT:  A portion of it may be.  So, instead of the

11  entire exhibit, if you wish to call the witness's attention

12  to a particular phrase or paragraph, you may.

13       MR. SPRINGER:  Thank you, Your Honor.

14  Q    (by Mr. Springer)  Take a look at Paragraph 8 on the

15  second page.  Now, before I ask you about you about it,

16  you're now telling the jury, aren't you, that you're really

17  not a salesman?

18  A    I am not an outside salesman, no.

19  Q    Well, let's break it apart.  Do you admit you're a

20  salesman for the company?

21  A    No.

22  Q    Do you admit you were a salesman?

23  A    I'm an estimator.

24  Q    So, not a salesman?

25  A    No.

Lederman - Cross                                    236

1    Q    Well, take a look at Paragraph 8 of this lawsuit and

2    complaint that your lawyers filed on your behalf in this

3    court in this case in August of 2007.  Does it not say that

4    plaintiff, that was you--

5    A    Correct.

6    Q    --was employed by Frontier as an inside, and then what's

7    the next word?

8    A    Salesman.

9    Q    From approximately March 19, 2002 to May 31, 2007.  Do

10   you see that?

11   A    I see that, yes.

12   Q    Well, is that complaint by your lawyers in this case

13   indicating that you were a salesman, is that correct or

14   incorrect?

15   A    They may have used the word salesman.  I did not give

16   them the word salesman.  I was always an inside estimator.

17   That's what my business cards state, that's what I've done

18   all my career, is an estimator.

19   Q    So, when your lawyers filed this on your behalf, you

20   disagreed with the characterization of you as a salesman; is

21   that your testimony, sir?

22   A    I didn't really--you can call me a salesman, call me

23   anything you want, the result is whatever I did at the job

24   was what the job was about, label it any which way you want.

25       MR. SPRINGER:  Judge, I would move the admission of the

1  first two pages--the first page only because it has the

2  caption, but the second page because it--

3      THE COURT:  Well, just the paragraph that you've just--

4      MR. SPRINGER:  Paragraph--

5      THE COURT:  8?

6      MR. SPRINGER:  8.

7      THE COURT:  Yeah.  So, you're admitting--we're admitting

8  only Paragraph 8, Exhibit R.

9      (Defendant's Exhibit R, Paragraph 8, was received in

10  evidence.)

11      MR. SPRINGER:  Thank you, Your Honor.

12      THE COURT:  All right.

13  Q   (by Mr. Springer)  Well, would you agree with me, sir,

14  that part of what you did was to sell the company?

15  A   Yes.

16  Q   And, I think you testified earlier that gee, there was

17  this point where you do the estimating, you put together a

18  bid; correct?

19  A   Correct.

20  Q   And, you sign off on that?

21  A   That's correct.

22  Q   And, then, you submit that bid to the prospective

23  customer or contractor; correct?

24  A   That's correct.

25  Q   But, sales isn't just simply sending in a bid, is it?

1  A    Sales, no, what I'm doing now is sales.  Estimating is

2  putting in a bid.  Sales is what I do now.

3  Q    Isn't there more to simply sales than putting in the

4  bid?  For example, don't you go and develop a relationship

5  with the customers from time to time for the sales?

6  A    Of course.  I mean, the whole idea in our construction

7  business is that, even as Mr. Willingham said, they have to

8  have a good comfort level that you know what you're doing.

9  And, by telling--excuse me.

10  Q    No, I'm sorry.

11  A    When you're going in to talk to those contractors, you

12  want them to have a good feeling that you really know what

13  you're doing, that your business is--that you're a good

14  business, and you're accurate and well known, and know what

15  you're doing.  It's, you know, you want to build up the

16  company, and yeah, I mean, there's nothing saying that the

17  estimator can't go in there and toot his own horn for his

18  company and say yeah, you know, I'm the senior estimator for

19  the best fire protection contractor in the state.

20  Q    And, that's what you did, isn't it?

21  A    That's exactly what I did, yes.

22  Q    And, then, after the estimate, when the bid got

23  accepted, if there was an issue about a change order or a

24  problem, you would want to go out and make sure that the

25  relationship with the contractor or the customer stayed

1   intact, that it was still good.  And, so, you'd visit the--

2   A    That had nothing to do with the change orders.  The

3   change order was strictly to make sure that my company was

4   whole, that we weren't doing work and not getting reimbursed

5   for it--

6   Q    Well--

7   A    --at that point.

8   Q    I'm sorry.

9   A    At that point, that's what the change order was for, and

10  that's why I stated before that you really had to get into it

11  and get it detailed, and the more detail you gave to the

12  contractor, the better chance you would have of getting

13  reimbursed for that cost.

14  Q    So--I apologize again.  Go ahead.

15  A    You know, there was always a resistance of the part of

16  an owner to pay a change order, whether it was deserved or

17  not.  And, it was the obligation of the general contractor to

18  go in there and support your claim for a change order for an

19  extra, and in order to do that, you had to give them a very

20  good and a very concise information as to why you were

21  entitled to that change order, so that he could have a better

22  idea, you know, he could have a better chance of coming back

23  and getting you that change order.

24  Q    And, that's what you did, isn't it?

25  A    Correct.  That had nothing to do with sales.

1   Q    And, you don't consider that to have anything to do with

2   sales of either the service or the product that the company

3   was selling?

4   A    Nothing whatsoever.

5   Q    And, by the way, there were, I think you testified that

6   Mr. Smith didn't pay overtime; did I hear you say that?

7   A    Oh, yeah.

8   Q    Isn't it a fact, sir, that all the employees in the

9   company were paid overtime from time to time, except for the

10  estimator?

11  A    No, sir.

12  Q    Are you aware that the people in the shop got paid

13  overtime?

14  A    Well, first of all, I'm not aware of their payroll

15  situation.  I can tell you I know for a fact that the fitters

16  in the field were obligated by contract through the union to

17  receive overtime.

18  Q    Well, they got overtime; right?

19  A    Right.  Correct.  I couldn't tell you about anybody in

20  the office that would ever receive overtime, if they did or

21  they didn't.  I wouldn't know.

22  Q    Well, you testified, told the jury that Mr. Smith didn't

23  pay overtime.  But, that's not a true statement, is it?

24  A    That's what he told me, he does not pay overtime.  I

25  can't tell you whether that had anything to do with any other

1   employee in the company.  There may have been other employees

2   that did get it, I don't know, he was very arbitrary on how

3   he did that.

4   Q    You did know that the estimator was not getting paid

5   overtime, that was you; correct?

6   A    That's what I was told many times, yes.

7   Q    And, that's exactly the way you were treated as an

8   estimator for every other company you worked for before going

9   to work for Frontier Fire; correct?

10        MR. LICHTENSTEIN:  Object--

11        THE COURT:  Overruled.

12   Q    (by Mr. Springer)  Correct?

13   A    I'm sorry, what was the question?

14   Q    How many fire protection companies did you work for

15   before working for Frontier Fire?

16   A    Including my own, probably five or six.

17   Q    Well, setting aside your own, so four or five?

18   A    Yeah.

19   Q    And, just before you went to work for Frontier Fire, you

20   worked for which company?

21   A    Diamond Fire.

22   Q    And, you worked, so to speak, overtime, you worked extra

23   hours in all those jobs, didn't you?

24   A    That's correct, yes.

25   Q    And, you never got paid overtime at any of those jobs,

Lederman - Cross                                     242

1   did you?

2   A     That's correct, I did not.

3   Q     And, that's because you understood that estimators were

4   actually the people that were selling to the public the fire

5   protection systems that those companies had?

6   A     No, not at all.  That's not my understanding at all.  My

7   understanding with the previous companies was that I was a

8   salaried employee, that I got the same paycheck week after

9   week after week, whether I worked six days, six weeks, six

10  months, it didn't matter, whether I was sick, vacation, if I

11  worked ten hours, I got paid, if I worked 50 hours, I got

12  paid the same paycheck every week.  This was the first

13  company that I ever got involved with that insisted that we

14  be an hourly employee for my position.  And, I had no problem

15  if they wanted to make me a salaried position, fine, but that

16  was not their position.  They did not want to do that, and I

17  was told on numerous occasions that we do not have salaried

18  people in this company, we pay strictly on an hourly basis.

19  And, that was what I was told, I don't know how many times.

20  Q     So, you deny that you were a salaried employee?

21  A     Absolutely.

22  Q     You deny that?

23  A     As I understand it to be.  As I understand a salaried

24  position to be, and maybe I'm not getting the technical word

25  here, but I understood through all these years that there

1   were two methods of payment, you either were a salaried

2   employee or you were an hourly employee.  If you were

3   salaried, there was no--you were never docked, you never got

4   paid overtime, you did whatever you had to do and that's how

5   it worked.  And, almost every contractor out there pays their

6   estimators on a salary.  Frontier Fire insisted--insisted

7   against my will that you're going to be hourly, and there's

8   nothing that you can say or do that's going to change it.

9   Q    So, you deny, sir, that when you met with Mr. Martin,

10  and Mr. Martin gave you Exhibit 1--do you remember

11  Plaintiff's Exhibit 1?

12  A    I'm sorry, what was the question?

13  Q    Do you deny when Mr. Martin gave you Exhibit 1, that you

14  told Mr. Martin that you wanted him to equal your salary that

15  you had at your former employer?

16  A    Yes, and my weekly compensation would be equal to what I

17  had now.

18  Q    You told Mr. Martin that, didn't you?

19  A    That's correct.

20  Q    And, Mr. Martin took $30.50 per hour, which was the

21  amount of money you were getting paid before, wasn't it?

22  A    That's correct.

23  Q    And, multiplied it by 2080 hours; correct?

24  A    That's correct, yes.

25  Q    And, so, he came up with a salary of $63,440; correct?

1   A    He came up--well, he came up with a compensation to me

2   of that hourly rate.  If I worked 52 weeks of 40 hours a

3   week, this is what I would get.

4   Q    Well, wait a minute.  He didn't reverse--he didn't take

5   $63,440 and divide it by 2080 hours did he, as you can see

6   from your own Exhibit 1?

7   A    No, he asked me how much I was making at Diamond.  I

8   gave him the rate that I was getting, but--

9   Q    Well, let me stop you for a minute.  The rate you were

10  getting was you told him $30.50 an hour.  Do you deny that?

11  A    Yes, sir.

12  Q    You deny it or is that what you--

13  A    No, no, that's correct.  I don't deny it.

14  Q    And, then, he multiplied it by the 2080 hours to come up

15  with $63,440, didn't he?

16  A    Yes.

17  Q    And, then, on each paycheck, they just divided it by 52,

18  and you got a paycheck which was one-fifty second of $63,440

19  every week, didn't you?

20  A    I got a paycheck based on a 40 hour week, whether I

21  worked 40 hours or 46 hours, it didn't make a difference,

22  they still only pay me 40 hours a week.  I was told at that

23  point that everything is hourly here.  I mean, how that

24  number came about, we were just trying to get a feel on what

25  I felt I needed to get for an annual compensation to make it

1   worthwhile changing my job from a small company, which is

2   Diamond, with a half a dozen employees, to a company like

3   Frontier with 100, and that's how we determined what the base

4   number would be.  That's what I was receiving at that point,

5   and that was what we started with.

6   Q    Would you take a look at Exhibit G in that same book,

7   sir?

8   A    Okay.

9   Q    Can you tell the jury what Exhibit G is?

10  A    It looks like a copy of a time sheet.

11  Q    Are there a number of time sheets?

12  A    Excuse me?

13  Q    Are there more than one time sheet in Exhibit G?

14  A    Oh, yeah, uh-huh.

15  Q    And, is that your handwriting at the top where it says

16  Gary Lederman?

17  A    Gary Lederman, yes.

18  Q    I'm sorry.

19  A    Yes, sir.

20  Q    And, is that your handwriting on the different pages

21  where it has numbers?

22  A    Yes, I believe so.

23       MR. SPRINGER:  Move the admission of Exhibit G.

24       MR. LICHTENSTEIN:  No objection.

25       THE COURT:  G is received.

1        (Defendant's Exhibit G was received in evidence.)

2    Q    (by Mr. Springer)  Let me show you from Exhibit G the

3    week ended 3-11-07.  Is that your handwriting, first of all,

4    Mr. Lederman?

5    A    Yes.

6    Q    And, you had a personal day on March 19th?

7    A    Yes, sir.

8    Q    And, did you get paid for the full week?

9    A    I probably did, yes.

10   Q    And, when you took vacation time, did you get paid for

11   the full week, even though you didn't work?

12   A    It was a paid holiday, I did, yes.

13   Q    Well, did you get vacation as well?  You're getting two

14   or three weeks a year towards the end of your employment?

15   A    My last year there, I accumulated--I was getting three

16   weeks paid vacation; correct.

17   Q    And, in 2006, you got a bonus of $40,000, didn't you?

18   A    That's correct.

19   Q    And, wasn't that on account of the fact you were working

20   hard and working long hours?

21   A    That was an arbitrary number that Mr. Smith was--it was

22   totally up to him.  It was part of my agreement with Steve

23   and Mr. Smith and Frontier Fire that part of my annual

24   compensation would be in the form of a bonus.  I received

25   various bonuses over the years, anywhere from a $15,000 bonus

1   to a $40,000 bonus.

2   Q    Well, the year before that you got the 40, how much did

3   you get?

4   A    The year before?

5   Q    Yeah, in 2005, did you get $25,000?

6   A    I believe the year before was $30,000.

7   Q    I'm sorry.  And, did Mr. Smith explain to you that part

8   of the reason for the bonus was the fact that you were

9   working hard?

10  A    No.  He, when I originally talked to Mr. Smith, part of

11  the enticement to get me to come to work was that he paid

12  bonuses.  It depended on how well the company did, obviously.

13  There was no set formula.  There was no set amount that he

14  could give me.  My first conversation with him actually he

15  told me that the estimators get around $25,000 bonuses a

16  year.  It was one of the pluses that I felt that, okay, I'm

17  going to come to work for this company.

18  Q    And, by the way, in this lawsuit, you started out suing

19  for a bonus; right?

20       MR. LICHTENSTEIN:  Objection; relevance.

21       THE COURT:  Overruled.

22       THE WITNESS:  Yes, I did.

23  Q    (by Mr. Springer)  What happened was in May of 2007, you

24  gave notice that you were quitting, you quit?

25  A    That's correct.

1   Q    And, then, the company gave you your three weeks of

2   vacation, didn't they?

3   A    I had already scheduled my three weeks vacation before I

4   had even given the notice, months before.

5   Q    Didn't they pay you for it?

6   A    Of course it was a paid vacation.  I was entitled to it.

7   The vacation was from year to year.  I could use it all the

8   first five--the first three weeks of the--of my renewal year,

9   or I could use it the last three weeks.  It was totally

10  arbitrary for me, and I was going on a cruise months ahead of

11  time, I had to get that okayed, and I did.

12  Q    And, then, you had your lawyer write a letter to the

13  company saying you'd better pay us, pay me, that's you, my

14  bonus for 2007, or we're going to sue you.  Do you remember a

15  letter to that effect?

16  A    I had requested from Mr. Smith when I was leaving that I

17  felt, and actually this goes back to Steve and Kenny, I sat

18  down with them and I explained to them when I gave them my

19  three weeks notice that I had left with about 75 percent of

20  the workload that we already had from the year ahead of time

21  already signed and contracts, I was leaving in good shape, I

22  was leaving them with three weeks notice, I helped train my

23  predecessor, and that the bonus was part of my compensation

24  on an annual basis.  It had nothing to do with whether it was

25  the beginning of the year, end of the year, whatever, it was

1   part of--well, I don't know where it went, but it was there--

2   it was part of that agreement that I would get a minimum of

3   $10,000 bonus a year, and every year that occurred.  In fact,

4   the first year I got a bonus, I was only working there nine

5   months, and I got a bonus.

6   Q    So, what--

7   A    So, I felt that I was entitled to at least part of my

8   bonus, and what I did was I took--I asked Mr. Smith for a

9   part of my bonus, and originally I had asked him for a very

10  small amount.  I wanted 50 percent of what I felt I was

11  entitled to.  Mr. Smith--

12  Q    So, what was--

13  A    Let me complete what I'm saying.

14       THE COURT:  He didn't ask the question.

15       THE WITNESS:  Excuse me?

16       THE COURT:  He gets to ask the question.

17       THE WITNESS:  Oh, I'm sorry.  Okay.

18  Q    (by Mr. Springer)  What was this small bonus that you

19  asked Mr. Smith for?

20  A    I wanted 50 percent of the $10,000 that they showed on

21  my sheet.

22  Q    That's not what you demanded, is it?

23  A    Not afterwards, no.

24  Q    You demanded a lot more than that, didn't you?

25  A    Well, Mr. Smith told me that he had spoken to his

1   attorney--

2       MR. SPRINGER:  I'm going to object to this.  I'd ask the

3   Court to instruct him to respond to my question.  I didn't

4   ask him anything about what he said about the communications

5   with me.

6       THE WITNESS:  Well, you're asking me how we determined--

7       THE COURT:  He asked the question.  You answered the

8   question asked.

9       THE WITNESS:  Okay.

10  Q   (by Mr. Springer)  Mr. Lederman, the dollar amount went

11  way up, didn't it?  That seems to be a yes or no question.

12  A   Yes.

13  Q   Did it go way up?

14  A   Yes, it did.

15  Q   You were demanding a lot more than half of $10,000;

16  correct?

17  A   That's correct.

18  Q   And, as a matter of fact, the $10,000, that wasn't any

19  sort of guaranteed bonus, was it?

20  A   No, it was an approximate.

21  Q   In fact, that piece of paper--

22  A   It was a working number.

23  Q   To save some time here, I won't go back to the piece of

24  paper, which is Exhibit 1, but it says approximate bonus of

25  $10,000; correct?

Lederman - Cross                        251

1   A    That's correct.

2   Q    And, you understood that that was a year-end bonus,

3   didn't you?

4   A    No.

5   Q    Do you remember having your deposition taken in this

6   case?

7   A    Yes, I do.

8   Q    And, do you remember you were under oath?

9   A    That's correct.

10  Q    Just like you are in this courtroom.

11  A    Uh-huh.

12  Q    Yes?

13  A    Yes.

14  Q    Do you remember a court reporter was there with a funny

15  looking machine taking down everything that was said in the

16  room?

17  A    Yes, I do.

18  Q    And, you had your lawyers there with you at the time?

19  A    Yes, I believe so.

20       MR. SPRINGER:  May we--I'm not sure how the Court wants

21  to proceed.  I have the original and I can tender it to the--

22       THE COURT:  All right.  Tender it to Mr. Smith.

23            And, let me explain clearly to the jury about

24  depositions.  I've also mentioned this earlier with respect

25  to how we're going to hear from Mr. Smith in the case.  But,

1   the rules of procedure that apply to matters of this type

2   provide that before the trial ever begins, but after the

3   case, the complaint, is filed, there is an opportunity to

4   obtain information from persons who may be witnesses in the

5   case.

6          And, one of the ways in which information can be

7   obtained is what we call a deposition, which is that at a

8   given time and place, with the lawyers for both sides

9   prevent, the witness is placed under oath, asked questions,

10  and the questions and answers are taken down by a court

11  reporter, and written up in what we call a transcript.  There

12  is no judge present at these meetings.  And, for certain

13  purposes, the transcript of that deposition may be used at

14  the trial.  And, that's true with respect to the depositions

15  of parties, and in this case, Mr. Springer wishes to call

16  attention to the testimony given at a deposition.

17         So, we have the transcript.  And, present the

18  transcript.

19      THE CLERK:   The witness is being handed a transcript of

20  his deposition taken March 26, 2008.

21      THE COURT:   All right.

22  Q   (by Mr. Springer)  Sir, would you turn to Page 26 in the

23  deposition?  Actually, it's Page 25, Line 24.  Do you

24  remember me asking you the question, "Now, did you say

25  anything to Mr. Martin when he said approximately $10,000?"

1    Your answer, "Yes."  My question, "What did you say to him?"

2    Your answer, "I told him that--I mean, I had heard that the

3    bonuses were around 25,000.  And, his response to me was that

4    all he could, he didn't prepare the bonus, all he could give

5    me was an approximate, which is what he showed.  It could

6    very well be more.  That's all he could commit to."

7           Question, "And, did you understand end of year

8    bonus meant--what end of year bonus--excuse me--and, did you

9    understand end of year bonus meant that the bonus would be

10   paid at the end of the year?"  Answer, "It was never

11   discussed."  Question, "Well, did you ask him what does end

12   of year bonus mean?"

13          What was your answer?

14   A    I said, "Well, and he said it was a Christmas bonus.   "I

15   assumed it was the end of the year."

16   Q    So, does that refresh your memory that in fact you knew

17   it was an end of the year bonus?

18   A    It refreshes my memory, but I had a different situation.

19   Q    I'm sorry?

20   A    I had a different situation than the rest of the

21   employees in the company getting a Christmas bonus.

22   Q    My question to you simply, sir, was you understood the

23   bonus was an end of year bonus; do you agree with that or

24   not?

25   A    No, I can't say I agree with that, no.

1   Q    Do you agree with me that Mr. Martin basically told you

2   that the company would pay you the $63,440 a year based on an

3   hourly computation; do you remember that?

4   A    Yes.

5   Q    And, in terms of this salesman question, we've already

6   gone through that, I'm not going to go back through it again,

7   but you did understand that part of what you did in your

8   position as an estimator was to sell the company; do you

9   agree with that?

10  A    I would prefer to use the word promote.  I promoted the

11  company, yes.

12  Q    I'm sorry.  And, then, would you agree with me that you

13  regularly and customarily were away from the office while you

14  worked as an estimator for the company; do you agree with

15  that?

16  A    Sure, there were portions of--there was 40 percent of

17  the time I could be away from the office.

18  Q    Well, you did your little pie thing there for the jury.

19  A    Sure.

20  Q    Could it be 50 percent?

21  A    There was no set--I mean, one week it could be, the next

22  week I could be stuck in the office for two weeks without

23  coming out.  It could be--every year, it could be a different

24  situation as far as what was going on with work, what type of

25  work.  That's a best guess number that we were trying to get

Lederman - Cross                              255

1   something as accurate as possible so that we can, you know,

2   you can see what I had to do.

3   Q    But, it is an estimate, isn't it?  In other words,

4   you're estimating 40 percent; correct?

5   A    Yes.

6   Q    But, it could just as easily be 50 percent; do you agree

7   with that?

8   A    No, I don't think I'm that far off.

9   Q    In any event, no matter what the percentage is, you will

10  agree with me that you are regularly and customarily away

11  from the office performing your job duty as an estimator; do

12  you agree with that?

13       MR. LICHTENSTEIN:  Objection; calls for a conclusion.

14       THE COURT:  Overruled.

15       THE WITNESS:  At times, I was away from the office.

16  Q    (by Mr. Springer)  That wasn't my question.  My question

17  is do you agree with me that you were regularly and

18  customarily away from the office doing your job?

19  A    No.

20  Q    Whose idea was it to get this company car?  Was that

21  your idea or the company's idea?

22  A    The company always had cars for their estimators, and I

23  always had a company car when I worked as an estimator, so

24  there was never any real conflict there.  It was agreed.

25  Q    You asked for the company car, didn't you?

Lederman - Cross                                    256

1    A    Sure.

2    Q    And, you were putting on about, and reporting to the

3    company, somewhere in the range of 15 to 20,000 miles a year,

4    weren't you?

5    A    Yes.

6    Q    As business expenses; correct?

7    A    As--

8    Q    As business mileage.  I'm sorry.

9    A    Well, total mileage.  The only thing I really worried--

10   at the end of the year, I took an odometer reading.  I didn't

11   keep any logs or anything.

12   Q    Would you look at the defendant exhibit book, sir, at

13   Exhibit K?

14   A    Okay.

15   Q    Is that your handwriting?

16   A    Part of it is.

17   Q    What part isn't?

18   A    The date on the top, parentheses, some numbers.

19   Q    Which numbers?

20   A    The 186, 33 percent.

21   Q    That appear to the right of the page?

22   A    Correct.

23   Q    Everything else is yours?

24   A    I believe so.

25   Q    And, is this a form that you would complete and hand in

1   to the company?

2   A     Yes.

3   Q     And, if you'd look at Exhibit L, sir?  Is that the same

4   form?

5   A     Yes.

6   Q     For a different time frame?

7   A     Yes, it is.

8   Q     And, then, I take it the handwriting to the right and at

9   the very bottom is someone else's other than your own?

10  A     That's correct.

11  Q     And, if you'd look at Exhibit M, is that the same form,

12  sir?

13  A     Yes, it is.

14  Q     And, the handwriting on the side and the percentage, and

15  the handwriting at the bottom that says 12-31-02 and 33,000,

16  those are written by someone other than you; is that right?

17  A     That's correct.

18  Q     But, the balance of the form is written by you?

19  A     Yes.

20  Q     And, this is, again, a form that you turned into

21  Frontier Fire for your mileage on the car?

22  A     It was an annual form we filled out once a year, giving

23  them the odometer reading and the mileage, yes.

24  Q     And, then, Exhibit N, sir, and Exhibit O and Exhibit P

25  and Exhibit Q, are those the same forms for different time

1   frames?

2   A     They're similar.  Which ones?

3   Q     All--

4   A     You're talking about N?

5   Q     Through Q.

6   A     N through Q.

7   Q     Yes, sir.

8   A     They're similar forms, yes.

9   Q     All by you?

10  A     Excuse me?

11  Q     All filled out by you?

12  A     No.

13  Q     Is that not your handwriting on Q?

14  A     No, it's not my handwriting at all on Q.

15  Q     Do you know whose handwriting it is?

16  A     To tell you the truth, I couldn't tell you.

17  Q     Do you know where this information came from?

18  A     Someone may have gone in and taken an odometer reading

19  from me.  But, nothing on that form was filled out by me.

20  Q     Well, let's look at Exhibit O, is that your handwriting?

21  A     Yes.

22  Q     Is that your signature?

23  A     Yes, it is.

24  Q     And, I can't remember if I asked you about N.  But, N

25  is--yeah, I did ask you, I think, about N, didn't I?  N is

1   your handwriting, isn't it, and your signature?

2   A    Yes, part of it's my handwriting and my signature, yes.

3        MR. SPRINGER:  Move the admission, Your Honor, of

4   Exhibits K, L, M, N, and O.

5        MR. LICHTENSTEIN:  No objection.

6        THE COURT:  All right, K through O.

7        (Defendant's Exhibits K through O were received in

8   evidence.)

9        MR. SPRINGER:  Thank you, Your Honor.

10  Q    (by Mr. Springer)  And, if we can just look at Exhibit

11  O, as an example?  Do you have that in front of you?

12  A    Yes, I do.

13  Q    I'm going to, at the risk of giving somebody a headache,

14  I'm going to slide this just so we can see it, it's Exhibit

15  O.  And, is that your signature, sir?

16  A    Yes, it is.

17  Q    And, the date at the bottom appears to be 12-31-05; is

18  that right?  12-30-05?

19  A    12-30-05; correct.

20  Q    And, then, you said there were these estimates of miles?

21  So, is it your testimony that you estimated 22,759 total

22  business miles driven during the year, that was just an

23  estimate?

24  A    It could have been.

25  Q    Well, why did you estimate it all the way down to the,

1  you know, to 59?

2  A    Most of the time, these forms were thrown on my desk,

3  and all I really was doing was taking the odometer reading,

4  didn't put a lot of thought or effort into them.  I just

5  filled it out and gave it in.

6  Q    You mean you say you didn't put a lot of thought or

7  effort into it, but then how did you come up with the number

8  22,759?

9  A    I could have taken the 97,743, deducted something, I

10  don't recall.  Most of the time these forms were--I used to

11  catch hell all the time because I never filled them out until

12  late, and they'd throw them in front of me, get it in, I need

13  it right now, and I would take it and put something on there,

14  and didn't really believe that there was anything here that I

15  really needed to worry about.  So, I, you know, I'd guess at

16  some of the numbers.  I don't know where I got that number

17  from, but I was probably in a hurry and I did it--somehow I

18  came up with that number.  I don't know if it's that

19  accurate, but at the time, I can't tell you how I came up

20  with the number.

21  Q    Well, is it fair to say that you were at least telling

22  the company that you were driving around 20,000 miles in some

23  years for the company, on company business?

24  A    Well, that's correct.  It was an odometer reading, can't

25  lie, whatever the difference is from year to year, same car,

1   I'm the only one driving it.

2   Q    And, you didn't use the car, did you, for personal--

3   A    No.

4   Q    --matters, it was a company car; correct?

5   A    That's correct.

6   Q    And, is it accurate to say that you went as far as Vail

7   and Colorado Springs and Loveland from time to time to pay

8   visits with customers, or potential customers?  Is that

9   right?

10  A    Yes.

11  Q    And, you'd go to the mountains on occasion?

12  A    Yes.

13       THE COURT:  We're at about 4:30, so we're going to

14  recess.  Mr. Lederman, you can return to counsel table.

15            And, members of the jury, I told you your work day

16  ends at 4:30, and that's what it is, 4:30.

17            So, we're well underway in the case.  You've heard

18  some evidence, of course, but certainly you haven't heard it

19  all.  So, again, I emphasize the importance of keeping open

20  minds until you have heard it all, including the Court's

21  instructions on the law that you must apply.  So, I am

22  instructing you to be careful here that you can comply with

23  the oath that you took earlier today, which is that you will

24  decide this case on the basis of that which you see and hear

25  in this room as evidence and law, and nothing else.

1          And, so, again, I repeat, you know, a number of you

2    have indicated that you use social network tools, and I

3    didn't ask details about whether this is--you're on

4    Blackberry of I-phone or Facebook or My Space or You Tube or

5    Line-in, or any of that, and I don't care.  What I care about

6    is, of course, that you don't use those devices to

7    communicate in any way anything about this case.

8          And, I don't know, it may be that since you've been

9    here today, you have persons with whom you regularly

10   communicate during the day, who may be inquiring what's up,

11   how come I haven't heard from you today, and your response

12   has to be that, well, I'm on a jury, and I'm ordered not to

13   talk with you about it.  So, that's--and, of course, people

14   at home or workplace, when they find out you're on a jury,

15   they're very curious about what the trial is about, and they

16   ask you well, what's going on.  You again, you have to tell

17   them that you're instructed you can't talk about it until

18   it's over.

19         And, of course, likewise with respect to using any

20   sources of information outside of the evidence in the case,

21   you're restricted as to that, too.  So, please cooperate with

22   us in this regard so we can do this trial the right way, and

23   get a verdict that stands.

24         So, with all that, members of the jury, you're

25   excused, again, 9 o'clock tomorrow morning is our starting

1   time.  So, be in the jury room at that time, please.  Well,

2   you're in a big hurry.  That's okay.  I don't blame you.  So,

3   you're excuse until 9 o'clock tomorrow morning.

4      (4:32 p.m. - Jury excused.)

5      THE COURT:  So, what is it about the Karl Smith

6   deposition?  I didn't bring it out here.  I don't have it in

7   front of me, but--

8      MR. LICHTENSTEIN:  It's pretty short, let me just read

9   to you--

10     THE COURT:  Sure.

11     MR. LICHTENSTEIN:  --the question and answer that I'm

12   concerned about.

13     THE COURT:  Yeah, why don't you come up so we can be

14   sure we get it on the record.  No, I mean from the lectern,

15   so the recording works.

16     MR. LICHTENSTEIN:  Sure.

17     THE COURT:  That's all I'm asking.

18     MR. LICHTENSTEIN:  Right, okay.  All right, at Page 21

19   of the deposition, the question reads--this is--

20     THE COURT:  These are all your questions; right?

21     MR. LICHTENSTEIN:  These are my questions, and this is

22   in the context of Mr. Lederman being interviewed to take the

23   job at Frontier.

24     THE COURT:  Yeah.

25     MR. LICHTENSTEIN:  And, the question to Mr. Smith was,

1   "Do you remember whether you considered him experienced at

2   all?"  Answer, "Oh, yes, we knew he was in the business and

3   went belly up, and so I knew he had experience."

4           So, my objection on that is under Rule 403, that

5   the--

6           THE COURT:  Went belly up?

7           MR. LICHTENSTEIN:  Yeah, I'd like to stop the testimony

8   at, "Oh, yes."

9           THE COURT:  Yeah.  Any problem with that, Mr. Springer?

10          MR. SPRINGER:  No, Your Honor.

11          THE COURT:  All right.  So, we won't read that part.

12          MR. LICHTENSTEIN:  You have one other that's going to be

13  a hearsay objection.  We don't have to do it today, but it's

14  kind of a matter of efficiency if you want to deal--

15          THE COURT:  Well, go ahead if you want to.  I told you

16  I'd rule on these as they come up, but if that's the only

17  other one--

18          MR. LICHTENSTEIN:  Okay, this is at Page 42 of the

19  deposition, and this is in the context of instances where Mr.

20  Smith believed that Mr. Lederman was using his vehicle for

21  unauthorized purposes based on the GPS system readings.

22          THE COURT:  Yes.

23          MR. LICHTENSTEIN:  And, Mr. Koslowski had obtained some

24  of that information apparently, so my question was, "Do you

25  recall what Kenny--that's Kenny Koslowski--told you about

1    what he learned from the GPS system?"  Answer, "Uh-huh, yes."

2    Question, "What did Kenny tell you?"  Answer, "I remember one

3    example.  Gary said he was someplace else, and he was taking

4    his wife to the airport to go East."

5         THE COURT:  So, the hearsay objection?

6         MR. LICHTENSTEIN:  Yes.

7         THE COURT:  Sustained.

8         MR. SPRINGER:  Well, Mr. Koslowski is going to be a

9    witness in the--

10        THE COURT:  Well, you can ask him then.  We ought to

11   hear it from Koslowski, not from Smith.

12        MR. SPRINGER:  All right.

13        THE COURT:  Okay.  All right, we'll see you at 9 o'clock

14   in the morning.  Court's in recess.

15        (4:36 p.m. - Whereupon, the proceedings were adjourned,

16   to resume at 9:00 a.m. on October 26, 2010.)

17

18

19

20

21

22

23

24

25

266

1                    TRANSCRIBER'S CERTIFICATE

2

3          I hereby certify that the foregoing has been

4    transcribed by me to the best of my ability, and constitutes

5    a true and accurate transcript of the mechanically recorded

6    proceedings in the above matter.

7          Dated at Aurora, Colorado, this 18th day of

8    January, 2010.

9

10

11

12

13

14                         /s/ Mary Chevalier

15                         Mary Chevalier

16                         Federal Reporting Service, Inc.

17                         17454 East Asbury Place

18                         Aurora, Colorado  80013

19                         (303)  751-2777

20

21

22

23

24

25

267

1                              I N D E X

2

3   WITNESSES:                    DIRECT   CROSS   REDIRECT   RECROSS

4   Plaintiff's:

5   Mike Willingham               134      150     155

6   Gary Lederman                 156      232

7

8

9

10                            E X H I B I T S

11

12  EXHIBIT NUMBER                         OFFERED   RECEIVED

13  Plaintiff's:

14  Plaintiff's Exhibit 1                  164       164

15  Plaintiff's Exhibit 4                  193       193

16  Plaintiff's Exhibit 5                  195       196

17  Plaintiff's Exhibit 2                  207       208

18  Plaintiff's Exhibit 8                  218       219

19  Plaintiff's Exhibits 7 and 9           224       224

20  Plaintiff's Exhibit 10                 228       228

21

22  Defendant's:

23  Defendant's Exhibit R, Paragraph 8     237       237

24  Defendant's Exhibit G                  245       245

25  Defendant's Exhibits K through O       259       259